Rhonda HENDRIX, parent and guardian
of Gatlin Perryman, a minor child,
Plaintiffs,

v.

EVENFLO COMPANY, INC., a foreign
corporation, Defendant.

No. 3:07cv133/MCR/EMT.

United States District Court,
N.D. Florida,
Pensacola Division.

Jan. 28, 2009.

572

Norwood Sherman Wilner, Aaron Metcalf, Wilner Block PA, Jacksonville, FL, Benjamin Charles Fields, Christopher Jacob Stucky, Evan Arthur Douthit, Raymond Douglas Gentile, Douthit Frets Rouse Etc, Kansas City, MO, for Plaintiffs.

Timothy J. McDermott, Ryan Richard Fuller, Akerman Senterfitt, Jacksonville, FL, Dan Howe Ball, Bryan Cave Llp, St Loius, MO, Rick E. Frawley, Bryan Cave LLP, Kansas City, MO, for Defendant.

### *MEMORANDUM OPINION*[1]

M. CASEY RODGERS, District Judge.

In this products liability action, Plaintiff Rhonda Hendrix claims that an infant car seat manufactured by Defendant Evenflo Company, Inc., failed to properly protect her newborn son, Gatlin Perryman, in a minor automobile accident. Hendrix alleges Perryman suffered head and spinal cord injuries during the accident which have led to Autism Spectrum Disorder [2] and a dangerous fluid-

---

1. On December 28, 2008, the court entered an order on the parties' twelve motions to exclude or limit expert testimony at trial (doc. 457). This memorandum opinion provides the rationale for the court's decision on each of the motions and is entered as an addendum to the order.

2. The parties and experts sometimes refer to Autism Spectrum Disorder (ASD) and autism interchangeably in the record. For example, Evenflo's expert, Dr. Edward Hoffman refers to

Perryman's condition as "autism" in his initial report (*see* doc. 335–5) and "autism spectrum disorder" in his supplemental report (*see* doc. 335–6), yet Hoffman never explains the significance of a distinction between the two terms, if any, in the context of his opinion. Although another expert attempted to draw a distinction between ASD and autism (*see* Epstein Report, doc. 304–2, at 12: "Over the past two decades, the term autistic spectrum disorder (ASD) has been introduced to reflect the broader spectrum

filled cyst in his spinal cord called a syringomyelia [3] that could eventually result in partial paralysis. Evenflo denies any defect in its infant car seat and also disputes all damages claimed by plaintiff.

The parties filed twelve motions to exclude expert testimony at trial, specifically, Evenflo's motions to limit or exclude the testimony of plaintiff's expert witnesses, Richard Noiseux, Gary Whitman, Charles Benedict, David Suhrbier, and Edward Hoffman, and Hendrix's motions to limit or exclude the testimony of defendant's expert witnesses, William Van Arsdell, Maureen Reitman, William Scott, Geoff Germane, Robert Zimmerman, Mark Epstein, and Joel Morgan.[4] The court initially scheduled a three-day evidentiary hearing on the motions, expecting to hear live testimony from the experts. The parties, however, asked the court to decide the motions on the written record instead.

The following facts are taken from the parties' memoranda and, except as noted, are undisputed. On April 17, 2002, while driving the two-week old Perryman to a doctor's appointment, Hendrix was involved in a minor traffic accident.[5] Although minor, the crash caused the vehicle's airbags to deploy, following which Hendrix exited the vehicle and retrieved Perryman, who had fallen to the rear floorboard, still secured in his then partially shattered car seat.[6] At the time of the accident, Perryman was restrained in an infant car seat manufactured by Evenflo and sold as the "Discovery" model.

Following the accident, Perryman was taken by EMS to Fort Walton Beach Medical Center for evaluation. Medical records confirm and the parties do not dispute that he sustained a contusion on his forehead and bleeding in his brain.[7] The parties do, however, seriously dispute the extent of Perryman's injuries and the cause of his present medical condition. The parties also dispute the location of Perryman's car seat in the vehicle at the time of the accident and whether the seat was unreasonably dangerous due to a defect in either design or manufacture.

The Discovery car seat, also known as a child restraint system (CRS),[8] is sold as a two-piece system, with the upper portion referred to as the "carrier" and the lower portion as the "base." The carrier consists of a stiff polypropylene outer "shell," which surrounds a padded fabric-covered bed where the infant is seated. A harness, threaded through holes in the bed, extends over the baby's shoulders and buckles to a

of clinical characteristics that now define autism."), this expert likewise did not explain how any such distinction is relevant in this case. The court notes that the American Psychiatric Association's Diagnostic and Statistical Manual (DSM) does not give a specific definition for ASD, referring instead only to Autistic Disorder, which it describes as "the presence of markedly abnormal or impaired development in social interaction and communication and a markedly restricted repertoire of activity and interests.... Autistic Disorder is sometimes referred to as *early infantile autism, childhood autism,* or *Kanner's autism."* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR) 70 (4th TR ed.2000). Based on the parties' own interchangeable references, the failure of any expert to offer a material distinction in the context of his opinion in this case, and the absence of a separate definition for ASD in the DSM, this order makes no distinction between the terms autism, autistic disorder, and ASD.

3. In medical terms, a syringomyelia is "the presence in the spinal cord of longitudinal cavities lined by dense, gliogenous tissue, which are not caused by vascular insufficiency." Stedman's Medical Dictionary 1545 (25th ed.1990).

4. The record on these motions was voluminous, filling 23 binders, the majority of which were three inches, and comprising literally thousands of pages of documents.

5. Hendrix's Ford Expedition hit the rear of another vehicle at a traffic light at a speed of no more than 11mph.

6. Passengers from the other vehicle assisted Hendrix with Perryman.

7. Perryman was diagnosed with a subarachnoid hemorrhage on MRI. This denotes bleeding between the brain and the thin tissues that cover it. *See* Stedman's Medical Dictionary 112, 1492 (25th ed.1990).

8. Some witnesses and the parties also refer to the Discovery as a "baby seat," "car seat," or "child safety system" (CSS). To avoid confusion between the Discovery and the Expedition's built-in seats, the court will use the term "CRS" when referring to the Discovery system as a whole, "CRS carrier" or "carrier" when referring to the carrier alone, and "CRS base" or "base" when referring to the base alone.

point between the baby's feet. The shell of the carrier has a stiff plastic handle which can be positioned "up," directly over the baby, or "down," at the head end of the shell. A care giver can thus use the handle to carry the carrier outside of the vehicle. The carrier is secured inside the vehicle either by using the seat belt to restrain the carrier, or by snapping the carrier securely into the optional base unit.[9] In either case, the carrier is intended to be installed so that the infant faces the rear of the vehicle. Both sides agree that at the time of the accident in this case the base was installed in the center of the second-row bench seat. However, as noted, there is a material dispute as to the location of the carrier at the time of the accident.

### Hendrix's theory of the crash

Hendrix maintains that at the time of the accident the carrier was seated in the base, in the back seat of her vehicle, with Perryman in it. According to Hendrix, at the time of impact, the carrier separated from the base, striking the hard center console between the driver and front passenger seats.[10] Hendrix believes the carrier shattered upon impact with the console, then fell to the floor behind the front passenger seat. Hendrix claims the separation of the carrier from its base and subsequent damage to the carrier was the result of a combination of several design and manufacturing defects, one of which she calls the "false latch"[11] scenario, which gives the care giver the false impression the carrier is secured to the base when in fact it is improperly seated, permitting it to separate from the base during a crash.

A properly restrained carrier is snapped securely into the base. This is done by seating a ridge at the toe end of the carrier under a "J-hook" on the base. The carrier then pivots downward at the J-hook so that the head end of the carrier snaps into a socket at the head end of the base. When the proper connection is made a clicking or snapping noise is heard. According to the Discovery instruction manual, once this click is heard the care giver should pull up on the carrier to confirm that the head end is properly seated into the socket. The Discovery is placed into a false latch scenario, as described by Hendrix, however, when the care giver unwittingly rests the toe end of the carrier *on top of* the J-hook rather than under it as intended. When the care giver pushes the head end of the carrier down into the base a click is heard, which seemingly confirms a secure connection. When the care giver then tests the connection between the carrier and base by pulling up on the carrier, the connection will appear secure.[12] However, according to Hendrix's false latch theory, unbeknownst to the care giver, the toe end of the carrier is not restrained by the J-hook and may move in a limited range and is also much more likely to separate from the base during an accident.

Hendrix claims the Discovery's design is unreasonably dangerous for three general reasons: (1) the head end of the carrier can snap into the base without the toe end being secure; (2) the confirming click occurs even in the false latch scenario, giving the care giver a false sense of security; and (3) Evenflo's warnings and manual are inadequate because the instruction to pull up on the carrier handle to test the connection does not specifically advise the care giver to check both the head end and toe end for secure placement. According to Hendrix, she and Perryman were victims of the false latch condition; that is, on April 1, 2002, when Hendrix installed the seat, she rested the toe end of the carrier on top of the J-hook, snapped the head end of the carrier into its socket, tested by pulling up on the carrier,

---

9. A seat belt is used to restrain the base. The base is designed to provide convenience; the base typically remains in the vehicle all of the time, so the seat belt connection need only be made once.

10. The base remained belted into the back seat.

11. Evenflo objects to the use of this term, although it also uses it. The court will use the term "false latch" because it is a convenient shorthand for the alleged condition.

12. Evenflo notes, and Hendrix does not seriously dispute, that in the false latch condition a gap appears between the carrier and base because the two pieces are not properly aligned. Hendrix maintains that a baby blanket over the toe of the carrier at the time she installed it hid the gap so she did not notice it.

and erroneously assumed the carrier was secure.[13]

Hendrix advances another theory of design and manufacturing defect relating to the latch inside the base that secures the carrier to the base. This latch is opened by pulling a plastic latch handle on the base, located below the head end of the carrier. The latch handle is secured to the base by two three-inch-long metal "fetter pins." After the accident, it was noted that the right-side fetter pin was missing from the Discovery's base.[14] Hendrix claims that the pin was missing at the time of the accident. According to Hendrix there are two design defects related to the missing fetter pin: (1) the use of a fetter pin is a nonstandard engineering solution and an unreasonably dangerous design; and (2) the absence of one fetter pin will permit an excess amount of play in the handle and its latch, making it even more likely that the carrier will separate from the base. Hendrix also claims Perryman's base suffered from a manufacturing defect, in that the pin was probably missing when the Discovery left Evenflo's factory. Finally, Hendrix claims that the CRS contained an additional defect related to the plastic material used in its manufacture. According to Hendrix, the carrier's polypropylene shell was improperly molded so that it was excessively brittle, and as a result the shell severely shattered when it struck the center console of the vehicle. Hendrix maintains that in a low-speed crash such as the one in this case a properly molded shell would not have sustained such severe damage because it would have absorbed more of the energy from the crash through ductile transformation rather than brittle failure.

### Evenflo's theory of the crash

According to Evenflo, Perryman's carrier was located in the front passenger seat, facing the rear, and was not installed in the base.[15] Under Evenflo's theory, the deploying passenger-seat airbag struck the leading edge of the carrier, producing the shattering.[16] Evenflo insists that only an airbag could have produced enough force to cause such damage to the carrier. Evenflo maintains the impact of the airbag caused all of Perryman's head injuries. Evenflo disputes all of Hendrix's design and manufacturing defect claims and seeks to introduce expert opinion to demonstrate the plausibility of its "front seat/air bag" theory of the crash. Evenflo also argues that Hendrix was aware of the dangers of placing a carrier in the front seat, and for support points to language in its own manuals as well as diagrams located in Hendrix's vehicle warning of the dangers of airbags.

### Extent and nature of Perryman's injuries

According to Hendrix, Perryman suffers from ASD, which was caused by the head injuries he sustained in the accident, and which presents significant challenges for Perryman and his family, including behavioral and developmental problems. Although experts on both sides agree Perryman will never be gainfully employed as a result of his ASD, Evenflo denies Perryman's ASD was caused by a head injury from the accident. Hendrix also claims that the trauma Perryman sustained in the accident caused a syringomyelia, which is likely to result in permanent nervous system degeneration. Although Evenflo concedes that trauma could cause a syringomyelia, it denies that Perryman has a syringomyelia; instead, Evenflo suggests Perryman has a different type of cyst known as hydromyelia, which is a result of a congenital defect in Perryman's brain. In any event, Evenflo insists Perryman's spinal cord cyst is presently asymptomatic and not likely to progress to any debilitating degree.

### Legal standards

■ Expert opinion is admissible under the Federal Rules of Evidence so long as the

---

13. At the time Hendrix installed the carrier and base on April 1, 2002, she was in labor and preparing to give birth to Perryman the next day. Hendrix claims that from the time she installed it until the time of the accident she never removed the carrier from the base.

14. The pin has never been found.

15. Evenflo's experts opine that the carrier was probably not even secured by a seatbelt.

16. It is undisputed that the vehicle's airbags deployed *on impact.*

opinion is reliable, relevant, and helpful to the fact finder. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); Fed. R.Evid. 702. It is a threshold responsibility of the trial court to determine the admissibility of expert testimony; in doing so, the court must ensure that speculative, unreliable opinions do not reach the jury.[17] *Daubert,* 509 U.S. at 592–93, 113 S.Ct. at 2796; *McCorvey v. Baxter Healthcare Corp.,* 298 F.3d 1253, 1256 (11th Cir.2002); *McClain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1237 (11th Cir.2005). Although the trial court's analysis of expert testimony must be thorough and exacting, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech. DC–8, Inc. v. Hurel–Dubois UK Ltd.,* 326 F.3d 1333, 1341 (11th Cir.2003). A trial court's decision to admit or exclude expert testimony is reviewed for abuse of discretion. *General Electric Co. v. Joiner,* 522 U.S. 136, 138–39, 118 S.Ct. 512, 515, 139 L.Ed.2d 508 (1997).

■ Specifically, in deciding whether to admit expert testimony the trial court must consider whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert;* and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*City of Tuscaloosa v. Harcros Chems., Inc.,* 158 F.3d 548, 562–63 (11th Cir.1998) (footnote omitted). The Eleventh Circuit refers to these three considerations separately as "qualification, reliability, and helpfulness," *United States v. Frazier,* 387 F.3d 1244, 1260 (11th Cir.2004), and has emphasized that they are "distinct concepts that courts and litigants must take care not to conflate," *Quiet Tech.,* 326 F.3d at 1341. First, as to qualification, the standard for admissibility is

not stringent. *Leathers v. Pfizer, Inc.,* 233 F.R.D. 687, 692 (N.D.Ga.2006). Although an expert must be at least minimally qualified in his field, his qualification to offer opinion at trial may be based on any combination of "knowledge, skill, experience, training, or education"; he need not be a leading authority in the field. *Id.;* Fed.R.Evid. 702. Also, so long as the expert is at least minimally qualified, gaps in his qualifications generally will not preclude admission of his testimony, as this relates more to witness credibility and thus the weight of the expert's testimony, than to its admissibility. *Trilink Saw Chain, LLC v. Blount, Inc.,* 583 F.Supp.2d 1293,1304 (N.D.Ga.2008).

■ The court next considers the reliability of the method used by the expert to reach his conclusions. At this stage, the court must undertake an independent analysis of each step in the logic leading to the expert's conclusions; if the analysis is deemed unreliable at any step the expert's entire opinion must be excluded. *McClain,* 401 F.3d at 1245 (quoting *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002)). In determining reliability, the court may ask: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *McCorvey,* 298 F.3d at 1256 (citing *Daubert,* 509 U.S. at 593–94, 113 S.Ct. at 2796–98). However, although helpful, these factors should not be considered the "definitive checklist or test" for reliability, *see Daubert,* 509 U.S. at 593, 113 S.Ct. at 2796, and, in some cases, evidence which does not meet all or even most of these factors may still sometimes be admissible, because other factors may predominate. *United States v. Brown,* 415 F.3d 1257, 1267–68 (11th Cir.2005). Other factors which may be relevant to a determination of reliability are (1) the nature of the field of claimed expertise, (2) the source of the expert's knowledge,

---

17. The trial court's responsibility is the same regardless of whether the expert opinion is scientific, technical, or otherwise specialized. *Kumho*

*Tire Co. v. Carmichael,* 526 U.S. 137, 147–49, 119 S.Ct. 1167, 1174–75, 143 L.Ed.2d 238 (1999).

(3) the expert's level of care in using the knowledge, and (4) the expert's consideration of alternative hypotheses.[18] *See* Fed.R.Evid. 702 advisory committee's note (2000). Regardless of whether the court considers some or all of these factors, at all times its focus must be on the methodology and principles used by the expert to reach his conclusions, not the conclusions themselves. *McDowell v. Brown*, 392 F.3d 1283, 1298 (11th Cir.2004). Finally, although the relevant criteria for reliability may vary based on the specific nature of a particular case, to be reliable the expert's testimony must always be based on "good grounds." *Daubert*, 509 U.S. at 590, 113 S.Ct. at 2795. "Leaps of faith" unsupported by good science preclude the admission of expert testimony. *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir.2002).

■■■■■ If the court finds the expert qualified to give his opinion and also finds the opinion reliable, the court must then consider whether the expert's opinion will be helpful to the trier of fact. By doing so, the court "ensures that expert witnesses will not testify about lay matters which a jury is capable of understanding and deciding without the expert's help." *In re Rezulin Prods. Liab. Litig.*, 309 F.Supp.2d 531, 541 (S.D.N.Y. 2004). When the trier of fact is "entirely capable of determining" issues in the case "without any technical assistance from … experts," expert testimony is unhelpful and must be excluded from the evidence. *City of Tuscaloosa*, 158 F.3d at 565; *see also United States v. Rouco*, 765 F.2d 983, 996 (11th Cir.1985). Otherwise, there is a risk the trier of fact will give the expert testimony undue weight on account of its special status. *See Cook ex rel. Estate of Tessier v. Sheriff of Monroe County*, 402 F.3d 1092, 1111 (11th Cir.2005) (holding that expert testimony is not helpful when it offers nothing more than what lawyers provide in closing arguments) (quoting *Frazier*, 387 F.3d at 1262–63). Finally, because of the potentially misleading

effect of expert evidence, *see Daubert*, 509 U.S. at 595, 113 S.Ct. at 2798, on occasion expert opinions that otherwise meet admissibility requirements may still be excluded under Fed.R.Evid. 403. Exclusion under Rule 403 is appropriate if the probative value of otherwise admissible expert testimony is substantially outweighed by its potential to confuse or mislead the jury, or if the testimony is cumulative or needlessly time consuming. *See, e.g., Hull v. Merck & Co., Inc.*, 758 F.2d 1474, 1477 (11th Cir.1985) (per curiam) (admission of speculative and "potentially confusing testimony is at odds with the purposes of expert testimony as envisioned in Fed. R.Evid. 702"); *see also United States v. Stevens*, 935 F.2d 1380, 1399 (3d Cir.1991) (expert testimony properly excluded because probative value was outweighed by concerns of "undue delay, waste of time, or needless presentation of cumulative evidence").

**Motions**

*1. Richard Noiseux*

Richard Noiseux, Hendrix's non-retained expert witness, is a corporal in the Florida Highway Patrol and responded to the accident at issue in this case. In the performance of his official duties Noiseux secured the scene, interviewed the passengers, and prepared a Florida Traffic Crash Report (doc. 333–3). According to Noiseux's report, Perryman occupied the rear center seat—consistent with Hendrix's theory. Evenflo challenges Noiseux's expert opinion under Rule 702 and *Daubert* on qualifications, reliability, and helpfulness grounds and also as prejudicial under Rule 403.[19] Evenflo also seeks to exclude Noiseux's crash report.

As a threshold matter, the court finds it unnecessary to consider whether Noiseux should be qualified as an expert witness in this case. At oral argument, Hendrix's counsel stated, "The decision to identify [Noiseux] as a non-retained expert was done out of

---

18. The last factor, "[w]hether the expert has adequately accounted for obvious alternative explanations," is particularly relevant to the facts of this case because of conflicting opinions as to the location of the carrier at the time of the accident.

19. Evenflo also cites Florida's statutory privilege concerning statements made for the purpose of preparing a traffic accident report, Fla. Stat. § 316.066(7), for the astonishing proposition that an accident report may not be used in a trial. This argument is meritless.

abundance of caution ... so we would not be subjected to the claim that the opinions that he gave as a fact witness when we walked him through his report" should have been introduced as the opinions of an expert. Thus, the court understands that Hendrix does not intend to call Noiseux as an expert witness at trial so long as he is permitted to testify as to the conclusions in his report.

▮ Public records and reports are excepted from the usual rule barring hearsay. In pertinent part, Rule 803(8) provides the exception for:

> Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth ... (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, ... or (C) in civil actions and proceedings ... factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness.

Fed.R.Evid. 803(8). The crash report at issue here is a public report made pursuant to Noiseux's duties under law, as a highway patrol officer. Thus, it is admissible under Rule 803(8)(C), unless there is some legitimate question of its trustworthiness.[20]

The court's understanding of Noiseux's report, as presented by both parties, is not that Noiseux undertook a detailed accident reconstruction or formed any independent conclusions concerning the location of Perryman in the vehicle, but rather that he simply followed his usual, official procedure of gathering relevant information regarding the accident and from that prepared a written report. Nothing in Noiseux's procedure suggests a lack of trustworthiness. The court has also considered Evenflo's conten-

tion that "[e]xpert opinion," in the context of a crash report, "based merely upon the statements of lay witnesses, not otherwise supported by competent evidence, is unreliable and must excluded." *Dallas & Mavis Forwarding Co., Inc. v. Stegall,* 659 F.2d 721 (6th Cir.1981). Evenflo suggests Noiseux's reliance on Hendrix's statements at the scene in reaching his conclusions makes his report unreliable because Hendrix was a biased witness. First, as noted, Noiseux will not testify at trial as "an expert." Nonetheless, the court is mindful of the potential for prejudice inherent in the admission of a police report prepared solely from the statement of a biased eyewitness. However, Noiseux did not rely solely on Hendrix's statements for his conclusion that Perryman and the Discovery carrier were in the rear seat at the time of the accident. Noiseux interviewed all passengers, inspected the interiors of both cars (including the deployed air bags), checked the CRS base, and gathered pieces of the broken CRS carrier from the rear floor of the Hendrix's vehicle.[21] Thus, the court is satisfied that Noiseux did not rely solely on Hendrix's statements in reaching his conclusions.

Finally, the court has considered Evenflo's argument that Noiseux's report and testimony should be excluded under Rule 403 and rejects it. Noiseux will be permitted to testify as a fact witness as to its preparation and the information it contains.

Evenflo's motion to partially exclude the testimony of Richard Noiseux was granted in part and denied in part.

### 2. Gary Whitman[22]

Gary Whitman, an expert for Hendrix, is a licensed engineer with a B.S. in mechanical

---

**20.** Section (B) is "concerned with public officials' own first-hand observation of events," whereas section (C) is concerned with " 'factual findings resulting from an investigation' sometimes involving disputed evidence." M. Graham, Federal Practice and Procedure: Evidence § 7049, n19 (Interim Edition) (citing *Baker v. Elcona Homes Corp.,* 588 F.2d 551 (6th Cir. 1978), *cert. denied,* 441 U.S. 933, 99 S.Ct. 2054, 60 L.Ed.2d 661 (1979)). Noiseux did not observe the crash firsthand, so section (B) does not apply here.

**21.** At deposition, Noiseux testified he gathered pieces of Perryman's CRS from the rear of the vehicle and took them to the hospital for possible use by Perryman's treating physicians in evaluating the forces that contributed to Perryman's injuries.

**22.** The materials provided by Whitman include: a preliminary report dated December 19, 2007 (doc. 247–10); a supplemental report dated June 19, 2008 (doc. 336–5); a supplemental report dated July 2, 2008 (doc. 336–7); a supplemental

engineering. He is the vice president of research and development at ARCCA, an engineering firm. Whitman's opinions are offered to show that Perryman's CRS was defectively designed due to its capability to false latch. Evenflo seeks complete exclusion of Whitman's opinions on the grounds that: (1) Whitman's false latch theories lack sufficient factual support; (2) Whitman failed to opine that false latch occurred and was the proximate cause of the accident, thus his opinion is unhelpful to the fact finder; and (3) Whitman's false latch testing was based on insufficiently reliable methodology. Evenflo also argues Whitman's opinions on issues other than false latch should be excluded for a variety of reasons.

Evenflo first argues there is no factual support for Whitman's false latch theory and notes that no witness, including Hendrix, can testify that the false latch condition existed at the time of the accident. Moreover, according to Evenflo, the record shows the carrier was properly attached at the time of the accident based on Hendrix's deposition testimony that she read the Discovery's instructions completely, attempted to install the seat per those instructions, heard the click of the latch, and pulled up on the carrier to confirm proper installation.[23] In response, Hendrix points to evidence in the record showing that the false latch condition was an obvious hazard with the Discovery of which Evenflo was aware, including Evenflo's Hazard Analysis files and the deposition testimony of Greg Allison, Evenflo's former engineer. Hendrix also submits that Whitman's opinion regarding the Discovery's potential for false latch finds support in Hendrix's deposition testimony. When asked whether she correctly installed the seat under the J-hook, Hendrix responded, "I cannot tell you, with all honesty, if I did or did not." Upon further questioning, Hendrix answered, "I can't tell you if I put it under that J-hook or not.... I thought I had it in there right.... I didn't see that it wasn't under a J-hook or I would have certainly fixed it ...." Hendrix also testified that she pulled up on the seat and it seemed secure. Finally, Hendrix points to facts that she claims could only have been the result of a false latch condition, including eyewitness evidence that the carrier and carrier pieces were on the floor of the vehicle, to show that false latch must have existed; otherwise, according to Hendrix, the car seat would not have detached from the base.

Whitman's opinions are offered to prove that the CRS was defectively designed because of its *potential* to false latch; he does not opine that the CRS was *actually* false latched at the time of the accident (that opinion is offered by Hendrix's expert Charles Benedict). Thus, for Whitman's opinions to be admissible, Hendrix need only show that Whitman relied on facts demonstrating design defect, not facts demonstrating that the CRS was in fact false latched at the time of the accident.[24] The court finds that Evenflo's Hazard Analysis files, the deposition testimony of former Evenflo engineer, Greg Allison, Whitman's own test results, and Hendrix's testimony are sufficient

report dated August 12, 2008 (doc. 336–13); and an affidavit in response to the instant motion dated September 10, 2008 (doc. 336–2).

**23.** Evenflo also relies on Hendrix's video deposition showing her correctly installing the seat. Def.'s Statement of Material Undisputed Facts, Ex. 25.

**24.** Evenflo argues that Whitman failed to opine that the false latch condition was the proximate cause of the accident and thus his opinion must be excluded because it is not *"Daubert* relevant." First, the court understands this phrase to refer merely to the third prong of *Daubert,* "helpfulness," and not, as Hendrix claims, to an improperly heightened legal standard. Moreover, as to proximate cause, Whitman's opinions need not support all elements of Hendrix's prima facie

case in order to be admissible under *Daubert.* Under Florida law, proximate cause is an issue for the jury unless the facts are "so clear that reasonable people could not differ." *Scheman– Gonzalez v. Saber Mfg. Co.,* 816 So.2d 1133, 1140 (Fla. 4th DCA 2002) (citing *Brito v. County of Palm Beach,* 753 So.2d 109, 113 (Fla. 4th DCA 1998)). So long as there is some record evidence for the jury to consider, expert testimony need not be introduced, and in this case the jury may properly consider Whitman's testimony. *See id.; McLeod v. Am. Motors Corp.,* 723 F.2d 830, 833 (11th Cir.1984). Thus, Evenflo is incorrectto insist that Whitman must have offered an opinion on the proximate cause of Perryman's injuries. Evenflo recites this argument throughout its memorandum.

facts on which Whitman could rely to reach his conclusion that a design defect existed.[25]

Evenflo's third argument is that Whitman's conclusions are not reliable because he did not test the complete false latch theory. Evenflo claims Whitman tested only the *result* of false latch—that the carrier allegedly separates from the base—without testing anything relating to the likelihood of *creating* the false latch condition. Thus, Evenflo argues, Whitman's methodology is incomplete. According to Evenflo, because the condition of false latch is, by definition, unknowlingly created, any testing procedure that calls for the intentional creation of the condition must be invalid. Instead, Evenflo submits a complete test must be conducted under "real world conditions," in a car, not a tabletop, and include: blind testing on consumers unaware of the purpose of the test to determine how often they spontaneously cause false latch; measurement of the amount of force necessary to false latch the carrier; and a determination of how frequently consumers notice the wide gap present during false latch and attempt to re-seat the carrier.

Hendrix maintains Whitman's methodology is reliable because it was adapted from a federal safety standard concerning testing for seat belt buckle false latch conditions.[26] She also responds that the only way to test the absence of a proper connection is to intentionally create the false connection, so Evenflo's complaint about Whitman's intentionally creating the scenario makes no sense. Finally, Hendrix responds that consumer testing on the frequency of real-world occurrences of false latching would be irrele-

vant to Whitman's opinion that the CRS contains an unreasonably dangerous design, and that any lack of additional or independent testing would go to the weight of the Because the court rejects it here, it will not be discussed again. evidence, not the admissibility of Whitman's opinion. As to the helpfulness of Whitman's opinion, Hendrix claims lay jurors would not likely appreciate the existence of false latching, or be able to predict the potential results of a false latch failure, so Whitman's opinion is necessary to introduce these concepts to the fact finder.

The court is persuaded by Hendrix's arguments. Whitman's expert opinions concerning the existence, cause, and results of the false latch condition are based on sufficiently reliable methodology and are helpful to the factfinder. Whitman's opinion does not go to the probability or frequency of the occurrence of false latching, so it is unnecessary for him to support it with blind studies.[27]

Evenflo also seeks exclusion of the following additional opinions of Whitman:

*a. Detachment propensity.* Evenflo has asked the court to exclude Whitman's opinion regarding the propensity of the CRS carrier to separate from its base. Whitman's preliminary report states that: Evenflo received 86 reports of Discovery detachments during an unspecified length of time; during crash testing in 1997, at 31 mph, the carrier detached from its base; false latch may have been the cause of detachment in one incident; and incidents of detachment are not always investigated by

---

25. The court finds Evenflo's Rule 403 objection to Whitman's testimony meritless.

26. The standard Whitman based his test on was promulgated by the National Highway Traffic Safety Administration, and is known as FMVSS 209 ("Seat belt assemblies"). It can be found at 49 C.F.R. § 571.209. Hendrix concedes that FMVSS 209 does not apply to CRS modules, but contends it is the most analogous standard. The standard applicable to CRS testing, FMVSS 213 ("Child restraint systems"), 49 C.F.R. § 571.213, contains no testing protocol for false latching.

27. The court likely would find it necessary at trial for Hendrix to introduce evidence of the amount of force necessary to create false latch-

ing. If a substantial amount of force were required—such that Hendrix could not reasonably have been expected to create the condition—then the theory would not be relevant to this case and would have to be excluded. However, the court has viewed the video depositions of Mr. Whitman, Dr. Benedict, and Dr. Van Arsdell, which appear to show that the condition can be created without the use of substantial force or special tools. Moreover, the amount of force needed is not an issue that requires expert testimony because the condition could be readily demonstrated, with adequate cross-examination, before the jury. Thus, Whitman's failure to measure the amount of force required to create the condition is not fatal to the admission of his opinions.

engineers. (Preliminary Report, doc. 247–10, ¶ 8, p. 15.) Based on these facts, Whitman concludes that "[t]he Evenflo Discovery is defective and unreasonably dangerous due [to] the vulnerability of the carrier to inadvertently detach from its base." The court finds that Whitman's generalized opinion regarding "the vulnerability of the carrier to inadvertently detach from its base" is not based on sufficiently reliable methodology and would create a risk of unfair prejudice under Fed.R.Evid.403. The 86 reports of detachment, gathered over an undefined period of time and resulting from potentially any number of causes, including those unrelated to false latch, do not support this generalized opinion. This is so particularly in light of Whitman's own admission that the Discovery model has been redesigned since Perryman's Discovery was produced, so that some of the detachment results could involve models other than the one at issue. Further, the raw number of detachment reports is meaningless in the absence of any comparison with the total number of Discovery units in use over the reporting period. Moreover, Evenflo's failure to rule out false latch in all detachment report cases does not automatically mean the Discovery has a general "vulnerability" to detachment. Finally, the court does not find the 1997 report of carrier detachment relevant to any opinion that Perryman's Discovery would have the propensity to detach; as Whitman is aware, the report concerned a preproduction model; Perryman's model had not even been designed by 1997. Whitman's general opinion concerning the propensity of the Discovery carrier to detach from its base will be excluded.

■ *b. Energy-absorbing padding.* Evenflo seeks to exclude Whitman's opinion that the Discovery is defective "due to its lack of effective energy managing padding lining its seat back and side wings." Evenflo argues that the padding studies Whitman relies on for his opinion are not reliable because in those studies the speeds were much higher, and also Whitman conducted no padding tests of his own. Hendrix responds that Whitman's opinions were based on "the laws of physics, prior testing, and crash investigations that other researchers and Mr. Whitman had conducted." Whitman's affida-

vit (doc. 336–2, ¶ 6) also cites research showing that energy-managing padding was in use at the time the Discovery was marketed and that such padding could significantly reduce forces in crashes.

The court finds Whitman's opinion that the Discovery was defective due to the lack of padding not based on sufficiently reliable methodology. Although the studies Whitman cites may constitute sound research and be well-accepted from an engineering standpoint, Whitman does not explain how the studies are applicable to the Discovery, and he offers no independent explanation of his methodology. Thus, this opinion will be excluded.

*c. Harness, tether, and seatback height.* At oral argument, Hendrix's counsel stated his intent to withdraw these opinions. The opinions thus will not be admitted at trial and the court need not consider them here.

*d. Fetter pin.* Evenflo seeks to exclude Whitman's fetter pin opinion. As described above, the handle on the Discovery CRS is attached by two fetter pins. When the lever on the handle is pressed and pulled the carrier releases from the base. On Perryman's CRS, one of the fetter pins was missing after the accident and was never found. Based on "witness marks" showing that the pin was inserted into its hole at one time, Whitman concludes "the fetter pin must have come out after being inserted prior to or during the subject crash." Additionally, and somewhat inconsistently, despite the witness marks, Whitman blames Evenflo's nonstandard engineering practices and what he characterizes as poor inspection practices at Evenflo's factory for making it "quite possible that the fetter pin was missing when" Perryman's CRS was sold.

At oral argument, Hendrix's counsel stated that Whitman's opinion will demonstrate that "the absence of the fetter pin even makes it more prone to false latch." Notably, however, in his preliminary report Whitman does not opine that the fetter pin design makes the Discovery design defective, nor does he discuss any testing of his own concerning the fetter pin. It was only after Evenflo filed its motion to exclude Whitman's opinion that

Whitman testified by affidavit that he had removed a fetter pin from an exemplar CRS and found it "easi[er]" to produce the false latch condition and that detachment also occurred "more easily." (Aff., doc. 336–2, ¶ 8(b), p. 13.) Evenflo argues that Whitman's opinions regarding the fetter pin cannot be admitted because they are based on speculation; Whitman cannot say whether the pin came out before the crash or during it; and Whitman does not opine that the fetter pin was defective. Hendrix responds that Whitman's affidavit makes clear he performed testing and found that the lack of a fetter pin makes false latch easier to produce and thus, detachment more likely. She also argues that Whitman did opine that the pin design contributed to making the CRS defective.

 The court finds Whitman's opinions on the fetter pin design and the possible existence or absence of the pin at the time of the crash utterly baseless and unreliable. There is no evidence in the record to show when the pin was likely removed and absolutely nothing suggesting the pin was not in the carrier at the time of manufacture. Additionally, Whitman describes his pin-removal test in the simplest of terms with no details. Whitman does not attempt to quantify how much "easier" it is to create false latch in the absence of a fetter pin, or how much more likely detachment is to occur in the absence of a pin. Whitman's opinion that the fetter pin was likely never inserted during manufacturing is also excludable under Rule 403, based on the prejudice likely to result to Evenflo were the court to admit Whitman's inconsistent and factually unsupported opinions; i.e., both that witness marks show the pin was inserted at one time *and* that the pin was never inserted.

██ *f. Failure to instruct.* Evenflo argues that Whitman is unqualified to opine that Evenflo should have warned consumers of the danger of false latch and should have explained how to avoid it. Evenflo also argues that because Whitman did not test his proposed warning label, his methodology is too speculative to permit admission of this evidence. Hendrix responds that an engineer is qualified to propose a warning label as part of an engineering solution and cites *Pineda v. Ford Motor Co.*, 520 F.3d 237, 248 (3d Cir.2008) for the proposition that an improved warning need not be tested in order to be admitted as part of an expert's opinion. The court finds that, given the evidence in the record supporting Evenflo's knowledge of the hazard, Whitman's opinion regarding Evenflo's failure to instruct consumers on the false latch potential of its product is admissible.

 *g. Negligence.* Evenflo seeks to exclude Whitman's opinion that it was negligent in its testing of the Discovery. Hendrix has not responded. Because any opinion that Evenflo was negligent is clearly a legal conclusion which Whitman is not qualified to offer, this opinion will be excluded.

Evenflo's motion to exclude the opinions of Gary Whitman was granted in part and denied in part.

### 3. Charles Benedict[28]

Hendrix offers the opinions of Dr. Charles Benedict to show that the plastic in Perryman's CRS was improperly molded, which Hendrix claims accounts for the severe shattering of the carrier shell, and also to show that false latch must have been the cause of the carrier separating from the base. Benedict holds a B.S., M.S., and Ph.D. in mechanical engineering. He is a consultant at BEC Industries in Tallahassee, Florida. Evenflo seeks complete exclusion of Benedict's opinions in the areas of improper molding and false latch, including his fetter pin opinion. Evenflo argues that Benedict's opinions about plastic molding should be excluded under Rule 702 because Benedict is not qualified in this area, and also because his methodology is not reliable. Evenflo also seeks exclusion of these opinions under Rule 403.

**28.** Benedict's opinion is presented through his preliminary report of December 20, 2007, (doc. 337–3); the June 20, 2008, supplement to that preliminary report (doc. 337–4); a further supplement of August 11, 2008 (doc. 337–5); and an affidavit of September 10, 2008 (doc. 337–6), which contains responsive assertions to various defense expert witness materials, motions, and memoranda.

Evenflo further seeks exclusion of any opinion about the false latch theory, for the same reason that it opposes the opinion of Hendrix's expert Whitman: an insufficient factual basis because no witness can testify with certainty that Hendrix created the false latch condition when she installed the seat.[29] Also as part of its false latch argument, Evenflo insists Benedict's opinions on fetter pins are inadmissible because they are insufficiently reliable under *Daubert* and should not be admitted under Rule 403.

*a. Plastic molding.* Evenflo argues that Benedict is unqualified to offer an opinion that Perryman's CRS was improperly molded and points out that Benedict has never designed or molded a CRS; has no degree in materials science; has injection molding experience that is dated, ending in the early 1990's; and has no experience detecting defects in improperly molded plastic. Moreover, Evenflo submits that specialized testing is required to detect plastics defects and, at deposition, Benedict could not remember the names of any of these necessary tests. Hendrix responds that Benedict is more than qualified to testify, specifically highlighting evidence that Benedict holds three engineering degrees; is a licensed engineer; is a board certified forensic examiner; has investigated over 200 accidents involving seat belts; and has been involved with or overseen the design and manufacture of several products made of polypropylene, the same type of plastic used in the manufacture of the Discovery CRS.

 As noted, the standard for determining an expert's qualifications to testify on a given topic is not stringent. So long as the witness is minimally qualified, objections to "the level of the expert's expertise [go] to credibility and weight, not admissibility." *Kannankeril v. Terminix Int'l, Inc.,* 128 F.3d 802, 809 (3d Cir.1997). The court finds that Benedict's background and experience are sufficient to qualify him to offer an opin-

ion as to the molding of Perryman's carrier. Evenflo's argument that Benedict has scant and dated experience with plastics is a matter for cross-examination.

Evenflo also claims that Benedict's plastic molding opinions are based on an unreliable methodology. Evenflo's argument is twofold: first, Benedict failed to test his theory that improper molding could cause *any* seat to shatter the way Perryman's did (doc. 309, pp. 1316), and second, Benedict also failed to test whether improper molding was the cause of *Perryman's* seat shattering (doc. 309, pp. 16–24). Evenflo highlights Benedict's deposition testimony that, although he was aware of a number of ways in which polypropylene can be defectively molded, he failed to perform any lab testing on any CRS, including Perryman's, in order to rule in or out any of these possibilities. Evenflo also states that the Discovery carrier is built using parts molded from three different types of plastic—the polypropylene shell, the ABS adjuster level, and the acetyl adjuster housing—which come from three different vendors. Because each material shattered in the accident, Evenflo argues that Benedict's opinion necessarily assumes that each vendor's plastic suffered from defective molding, which it claims is highly unlikely. Hendrix first responds (doc. 337, pp. 19–23) that Benedict did not need to perform any testing, because no properly molded seat of any type of plastic could have failed in the way that Perryman's did. Thus, Hendrix also insists that Benedict did not need to identify the specific manufacturing defect that was present. Hendrix also claims that no testing to replicate the shattering could be done, because it is impossible to obtain another CRS with a manufacturing defect sufficiently similar to the one in Perryman's CRS due to the "variable" nature of manufacturing processes. Finally, Hendrix also notes that, although not required to, Benedict did conduct some testing: "fractography," a scientific process of examining the

---

**29.** Although Evenflo mentions in part of a single sentence that Benedict lacks the qualifications to testify as to the false latch condition, doc. 309, at 6–7, nowhere else does Evenflo discuss why Benedict would be unqualified to opine on this subject. Benedict is a licensed engineer with significant mechanical engineering expertise and it

appears that this expertise would adequately qualify him to testify about false latch. Because Evenflo did not advance this argument, the court assumes Evenflo intended to challenge only Benedict's qualifications to testify as to improper plastic molding.

fracture surfaces to determine what forces operated on the seat. She points out that fractography was also used by Evenflo's plastics expert Dr. Maureen Reitman.

Although Evenflo's argument regarding the improbability of multiple types of plastic all suffering from the same manufacturing defect is convincing, the court nonetheless finds that Benedict's failure to perform any tests other than fractography is a matter for crossexamination at trial. *See Clay v. Ford Motor Co.*, 215 F.3d 663, 668–69 (6th Cir.2000) (quoting *Daubert*, 509 U.S. at 596, 113 S.Ct. at 2798). Physical testing is not an absolute prerequisite to the admission of expert testimony. *Cummins v. Lyle Indus.*, 93 F.3d 362, 369 (7th Cir.1996). Finally, the court has also considered Evenflo's argument that introduction of Benedict's improper molding opinions would unduly prejudice the fact finder. The court is satisfied that an adequate opportunity to cross-examine Benedict's factual basis, qualifications, and methodology will prevent any prejudice to Evenflo.

*b. False latch.* Benedict opines that false latch is a real condition which, if created, renders a CRS dangerously defective, and that Perryman's CRS was false latched at the time of the accident. Thus, Benedict echoes Whitman's opinion that a design defect (the potential to false latch) existed, but also goes further in opining that the defect was the proximate cause of Perryman's injury. As with Whitman's opinion, the court finds Benedict's opinion regarding the existence of a design defect admissible.

Evenflo seeks exclusion of Benedict's opinion that the defect operated to cause Perryman's injuries, because Evenflo maintains there is no factual support to show that Hendrix placed the carrier into the false latch position. (Doc. 309, at 7–13.) Indeed, Evenflo points to Hendrix's deposition testimony that she believed the carrier was properly attached. Evenflo also notes that Benedict did no testing of any kind that would support his opinion, including testing with typical consumers to determine if they also would create false latching. Finally, Evenflo highlights Whitman's purportedly conflicting testimony that he did not believe anyone

could "know physically that it was false-latched." Evenflo submits that because Whitman does not believe anyone could opine as to the existence of the false latch condition, Benedict's opinion should be excluded as contradictory. Hendrix responds that a sufficient factual record exists to support Benedict's opinion that the carrier was false latched at the time of the accident, including the same facts she presented as to Whitman's factual basis for design defect (e.g., Hendrix's deposition testimony that she did not know, "with all honesty, if I did or did not" correctly install the carrier and facts supporting the existence of the defect itself, including Evenflo's internal reports). (Doc. 337, pp. 11–17.)

The court finds there is sufficient evidence on which Benedict could base his false latch opinion: primarily, Hendrix's own equivocal deposition testimony as to whether she had properly latched the carrier, but also the nature of the alleged defect itself, which could cause a consumer to believe that the carrier was correctly latched even if it was not. Evenflo's argument that Whitman should have conducted consumer testing is unconvincing because testing whether a typical consumer can or will false latch a carrier under test conditions sheds little light on whether Hendrix unwittingly false latched Perryman's carrier to the base before the accident. Moreover, Benedict's opinion is that no condition other than false latch could have permitted the carrier to separate from the base; in this respect, it concurs with Evenflo's own experts' opinion that a properly latched carrier could not separate from the base. Finally, any conflict between Hendrix's experts is for the fact finder to resolve.

*c. Combination of plastic molding and false latch.* Based on the court's decision, Evenflo's argument that Benedict's two opinions are inseparably intertwined and that exclusion of one requires exclusion of the other is now moot.

*d. Fetter pin.* Benedict opines that a missing fetter pin makes it more likely that the false latch condition will be created, as well as more likely that the base latch will move more freely, making carrier detach-

ment more likely. Benedict also opines that the fetter pin was "most probably missing ... prior to the accident." Benedict does not base these opinions on any discernible methodology. All of Benedict's fetter pin opinions will be excluded.

Evenflo's motion to exclude the opinions of Charles Benedict was granted in part and denied in part.

### 4. *William Van Arsdell*[30]

Evenflo seeks to offer the opinion of Dr. William Van Arsdell that Perryman's car seat was shattered by a deploying front-seat airbag, an opinion he reached based on tests he designed and conducted to evaluate the parties' opposing theories of the accident. Van Arsdell holds B.S., M.S., and Ph.D. degrees in mechanical engineering and he is currently an engineer at Engineering Principles in Natick, Massachusetts. Hendrix seeks complete exclusion of Van Arsdell's opinions in this case on multiple grounds. As a threshold matter, Hendrix attacks Van Arsdell's qualifications to offer opinion in the areas of seat belts, CRS systems, kinematics (the movement of bodies and objects), and federal safety standards. She also challenges his opinions on the basis that they lack a factual foundation, are based on an unreliable or nonexistent methodology, and are otherwise speculative or unreliable. Evenflo responds that Van Arsdell is fully qualified, and his methodology and factual bases are appropriate.

Hendrix does not attack Van Arsdell's qualifications to offer all of his opinions, only those which she groups into the subjects "a) motor vehicle restraint system design, testing and performance; b) child safety seat design, manufacturing, testing and performance; c) occupant kinematics/biomechanics; and d) compliance with Federal Motor Vehicle Safety Standard ('FMVSS') 213." Hendrix argues Van Arsdell had no experience in these areas before he became an engineering consultant in 1997 and the court should not

give any credibility to experience amassed while engaged in litigation matters. Evenflo responds that Van Arsdell is a multi-degreed mechanical engineer, has participated in thousands of automotive sled tests, and more than satisfies the requirements of Rule 702. Additionally, Evenflo submits that although Van Arsdell is largely engaged in litigation consulting, the court should not ignore this experience in assessing his qualifications.

In the court's view, Hendrix has taken an overly narrow view of the test for qualification in Van Arsdell's case. For example, Hendrix argues that Van Arsdell should not be considered qualified based on the fact the he has not taken any college-level courses on vehicle restraint systems at the university level; however, the court is not aware that such courses even exist. Evenflo has adequately demonstrated Van Arsdell's experience in the relevant areas through his experience with crash testing, sled design, and occupant kinetics, including experience, including testing with crash dummies, notwithstanding the absence from his educational background of a college level course in vehicle restraint systems. His multiple engineering degrees, numerous publications, dedicated concentration in the field of crash testing, and his NHTSA Child Passenger Safety Technician certification more than satisfy the court as to his qualification to offer his opinions in this case.[31] Finally, the court rejects Hendrix's challenge to Van Arsdell's qualifications to opine as to Evenflo's compliance with FMVSS 213, a regulation promulgated by the National Highway Traffic Safety Administration (NHTSA) providing minimal performance requirements and a testing procedure for CRS modules. 49 C.F.R. § 571.213. Van Arsdell's mechanical engineering background renders him qualified to opine on Evenflo's compliance with this standard; the court finds his conclusion is "of a type reasonably relied upon

---

**30.** Van Arsdell's opinions are presented to the court through an initial report of March 3, 2008 (docs. 247–13, –14, and –15) and a supplemental report of August 6, 2008 (doc. 288–5).

**31.** Van Arsdell will be permitted to offer opinion as to whether, from a biomechanics standpoint, Perryman's injuries are consistent with those expected from an exploding airbag, but Van Arsdell will not be permitted to offer medical causation testimony.

by experts in the particular field." Fed. R.Evid. 703.

Hendrix challenges other opinions held by Van Arsdell which she claims lack factual or scientific foundation or are otherwise speculative or reliable.

 a. *Van Arsdell's airbag tests.* Van Arsdell designed and conducted tests of Evenflo's theory that Perryman's carrier was in the front passenger seat and shattered as a result of the exploding air bag. In test "# 1–front," a Discovery carrier was belted into the front passenger seat without a base. The carrier's handle was placed in the "up" position and the front passenger seat was positioned two notches aft of full forward. The air bag was deployed. According to Van Arsdell, the test carrier's shell fractured much like Perryman's. Also, Van Arsdell found abrasions on the test carrier that he claims are similar to those on Perryman's carrier; he opines that the abrasions match the weave of the airbag's fabric, suggesting that an airbag made contact with Perryman's carrier. Van Arsdell also noted that the test vehicle's windshield was cracked and that the airbag cover was asymmetrically deformed, both of which occurred in the accident. In test "# 3–front," the passenger airbag was permitted to discharge without a Discovery in the front seat. In this test the airbag cover was deformed symmetrically and the windshield was not cracked.

 Hendrix objects to Van Arsdell's testing on multiple grounds. First, Hendrix contends that certain parameters of the tests have no factual support in the record, and therefore the tests should be excluded as irrelevant and prejudicial. Specifically, Hendrix objects to the placement of the passenger seat at two notches aft of full forward, and to the positioning of the carrier's handle in the "up" position. Evenflo responds that Hendrix's criticisms do not pertain to the validity of dynamic sled testing overall, but only to particular parameters; thus, Evenflo argues her objections relate to the test's accuracy and the weight of the evidence rather than its admissibility. The court finds that, on the whole, the conditions of Van Arsdell's tests were substantially similar to those present at the time of the accident and therefore the test methodology is reliable. Van Arsdell used a test buck built from a 2000 Ford Expedition, mounted on a sled at a 5° counterclockwise angle,[32] and in the tests, the buck underwent an 11mph collision. The CRS was fitted with an infant dummy weighing 7.5 pounds and measuring 20.5 inches long. These general parameters are identical to the undisputed facts. Additionally, as to the disputed parameters, such as the seat position, there is at least some factual support for Evenflo's version in the record. As to the seat position, Hendrix testified in deposition that the driver's seat was in the full forward position—Hendrix is 5′1″ tall—and that the passenger seat was "a little further back than mine." Thus, Van Arsdell believed it reasonable to position the seat two notches back. As to the carrier handle, in another deposition, one of the passengers from the other vehicle offers arguably equivocating testimony on the position of the carrier handle. Hendrix will be entitled to cross-examine Van Arsdell as to the factual support for his tests.

 Hendrix also objects to Van Arsdell's explanation of why the damage to the test Discovery was not as severe as the damage to Perryman's carrier in the accident. According to Van Arsdell, any one of the following scenarios could account for the difference: (1) Perryman's carrier was unrestrained and moved closer to the airbag; (2) Perryman's carrier was improperly positioned with the head end higher up, directly in the path of the airbag; or (3) the passenger seat was farther forward during the accident. Although any one of these scenarios might account for greater damage to Perryman's carrier, Van Arsdell conducted no testing of any of these scenarios. Van Arsdell simply suggests, without testing, that these scenarios could have accounted for the difference in damage. Although testing is not always a prerequisite to reliability, an expert who conducts no testing must be prepared with " 'a good explanation as to why his or her conclusion remained reliable' notwithstanding the absence of testing." *Bauer v.*

---

**32.** Hendrix testified that she attempted to steer left to avoid hitting the car ahead.

*Bayer A.G.*, 564 F.Supp.2d 365, 379 (M.D.Pa. 2008) (quoting *In Re Paoli R.R. Yard PCB Litig. ("Paoli II")*, 35 F.3d 717, 760 (3d Cir.1994)). Van Arsdell has not offered a sufficiently reliable explanation for why these hypothetical scenarios account for the difference in damage. Moreover, there is no factual support for these scenarios in the record. Van Arsdell's suggested alternative explanations for the difference in damage to the carriers will be excluded.

*b. Van Arsdell's fetter pin opinions.* Van Arsdell maintains that witness marks on Perryman's carrier show that a fetter pin was once inserted. According to Van Arsdell, the most likely explanation for the absence of the fetter pin is the airbag impact. Because the court has excluded plaintiff's experts' opinions regarding the fetter pin, Van Arsdell's explanation is not relevant and will be excluded on that basis.

Hendrix's motion to exclude the opinions of William Van Arsdell was granted in part and denied in part.

### 5. Maureen Reitman[33]

Dr. Maureen Reitman is Evenflo's engineering and materials expert on the cause of the fracture of Perryman's CRS. She is an engineer employed by Exponent, a firm specializing in the analysis and prevention of engineering failure. She holds a B.S. and Sc.D., both in materials science and engineering, from the Massachusetts Institute of Technology. Reitman's opinion is that Perryman's carrier was located in the front seat of the Expedition at the time of the accident and consequently was struck by the exploding airbag. Reitman reaches this conclusion based on the fracture pattern of Perryman's Discovery and on witness marks and abrasions on the carrier which appear to be caused by airbag fabric. She also relies on her conclusion that Perryman's carrier did not shatter as a result of contact with objects in the back seat. Finally, Reitman opines that the carrier was properly molded, that the Discovery consistently met federal safety

standards for car seats, and that a fetter pin is a sound choice for mechanical joining.

Hendrix seeks the complete exclusion of Reitman's opinions. Hendrix challenges Reitman's opinions on the grounds that she is not qualified in the areas of child safety seat design, manufacturing, testing, and performance, and/or compliance with FMVSS 213 and specifically points to evidence showing that, among other things, Reitman has never designed any CRS, is not an expert in occupant kinematics or accident reconstruction, and never analyzed vehicle restraint systems before beginning her career at Exponent. Hendrix also challenges some of Reitman's other opinions on grounds they lack a sufficient factual foundation or rely on erroneous facts and are based on an unreliable methodology. Specifically, Hendrix claims Reitman's reliance on Van Arsdell's sled tests makes her opinions unreliable, and that Reitman's conclusions as to why Van Arsdell's airbag test did not crack the test carrier, why there was a missing fetter pin, and why the metal locking clip on the bottom of the carrier was bent are also unreliable. Hendrix also seeks exclusion of Reitman's "drag tests" both on grounds that they were conducted outside the discovery window and because they are based on an entirely "made up" methodology. Evenflo responds that Reitman's credentials more than qualify her to offer opinions in this case. Evenflo also contends that her opinions are supported by a plausible factual basis, and she was not required to test her alternative explanations. Finally, Evenflo states that the drag tests were conducted only to show what wear and tear looks like.

The court finds Hendrix's challenge to Reitman's qualifications entirely baseless. Reitman's opinion is being offered to establish that Perryman's polypropylene seat shattered as a result of a high-energy impact from an airbag and not as the result of improper molding. Her two MIT degrees in materials science are therefore particularly relevant. Her doctoral research was in polymers and her engineering practice has fo-

---

**33.** Reitman's opinions are offered through an initial report dated March 3, 2008 (doc. 247–16); a supplemental report of August 7, 2008 (doc. 315–25); and a September, 2008 affidavit (date not specified) (doc. 342–3).

cused on polymer failure. Reitman's extensive education and experience in the field of materials science, particularly her specialization in polymers, make her more than adequately qualified to offer such opinions.[34]

Hendrix also challenges Reitman's qualifications to opine regarding Evenflo's compliance with FMVSS 213 in the design of Perryman's Discovery CRS. Evenflo responds that Reitman is qualified to testify that, when tested against the standard, the Discovery CRS passed approximately 175 times. The court notes that Reitman reviewed test reports to reach this conclusion, and that as an engineer, she is adequately qualified to opine on this subject. Moreover, as noted with Van Arsdell, Reitman's conclusion about Evenflo's compliance with a safety standard is based on data "of a type reasonably relied upon by experts in the particular field." Fed.R.Evid. 703. Hendrix's challenge to Reitman's opinions regarding FMVSS 213, therefore, is rejected.

Hendrix objects to Reitman's other opinions based on inadequate methodology and factual support:

a. *Reliance on Van Arsdell's testing conditions.* Hendrix challenges Reitman's reliance on Van Arsdell's tests because, according to Hendrix, those tests were conducted with the passenger seat located two notches behind the full forward position and with the carrier handle in the "up" position, neither of which factual scenario is supported by the record. Hendrix, thus, contends that Evenflo's entire airbag theory and testing are unreliable and inadmissible. As the court concluded with Van Arsdell, any discrepancy between these parameters and what the jury determines to be the true facts of the accident relates to the weight of the expert's opinion, not its admissibility. There is factual support in the record for both scenarios, albeit disputed.

b. *Explanations for why Van Arsdell's test seat did not shatter as severely as Perryman's.* It is undisputed the carrier used in Van Arsdell's airbag tests did not shatter as severely as Perryman's carrier did in the accident. The court has already addressed Van Arsdell's theories to explain this. Reitman has her own theories, which are outlined in her report:

> Variations in the observed damage patterns and witness marks on the two exemplar carriers (Plaintiffs' and Defendant's tests) impacted by airbags and the subject carrier do not affect my overall analysis or ability to conclude to a reasonable degree of engineering certainty that the subject carrier was in the front passenger seat at the time of the incident and was damaged as a result of impact from the airbag. *Variations are expected due to minor differences in speed and angle of vehicle impact, airbag folding, position of the restraint on the seat, seatbelt tension, and the absence of a seatbelt, initial carrier angle, or other factors.*

(Emphasis added.) Hendrix argues that because Reitman did not test these other theories they are thus entirely speculative and should be excluded from the trial. Evenflo responds and argues it would be impossible to test all possible variations until the precise shattering pattern experienced by Perryman's carrier was reached. Evenflo also points out that in reaching her conclusion, Reitman relied on NHTSA test cases with similar, but not identical, levels of damage. As with Van Arsdell, the court finds that Reitman's alternative explanations for the difference in damage between the test carrier and Perryman's carrier are purely speculative, having no factual support in the record.

c. *Fetter pin opinions.* According to Reitman, there are "bite marks" on Perryman's CRS showing that the missing fetter pin was inserted at one time. She also opines that flexing of the polypropylene during the crash, producing expulsion of the pin, is the most likely reason it is now missing. As with Van Arsdell, because the court has excluded plaintiff's experts' opinions regarding the fetter pin, Reitman's fetter pin opinion is also not relevant and will be excluded.

---

**34.** The fact Reitman has not actually designed a CRS may be a matter for plaintiff on cross-examination.

■ *d. Bent locking clip.* After the accident, the metal locking clip on Perryman's CRS was bent.[35] Reitman opines that this bending was "consistent" with the clip being inserted and bent by the same flexing force from the airbag that expelled the fetter pin. This locking clip opinion is based on no methodology, and none of the four airbag tests, or any other data, show that an airbag impact would bend the clip. Because this opinion is based on no testable hypothesis, it will be excluded from the trial.

■ *e. Drag tests.* Reitman's August 7, 2008, supplemental report attempts to rebut Benedict's opinion that all of the marks on Perryman's CRS are from either normal wear and tear or impact with the Expedition's rear console during the accident as opposed to airbag fabric. Reitman subjected an exemplar Discovery to a series of "drag tests" under which the CRS was drug across various floor surfaces, then photographed, and a comparison made of the marks on the exemplar CRS and those found on Perryman's CRS. Hendrix seeks exclusion of these test results based on Reitman's inability to adequately duplicate the wear and tear Perryman's CRS experienced in the year of use before the accident. Evenflo responds that Reitman performed the tests solely for the purpose of having available photos which indisputably show wear and tear. Reitman's drag tests will be excluded on two grounds. First, they are excluded on Rule 702 "helpfulness" grounds, because a jury has enough common experience with polypropylene, an everyday substance, to know what ordinary wear and tear marks look like and where they are typically found. The drag tests are also excluded because Reitman gives no serious methodology for creating "typical" marks, so her tests lack reliability and also relevance.

Hendrix's motion to exclude the opinions of Maureen Reitman was granted in part and denied in part.

### 6. William Scott[36]

Dr. William Scott is an Evenflo expert on kinematics. He is a principal consultant in biomechanics, occupant kinematics, injury causation, and vehicle crash worthiness at Biodynamic Research Corporation in San Antonio, Texas. He holds a B.S., an M.S., and a Ph.D. in engineering science from the State University of New York in Buffalo. Hendrix seeks complete exclusion of Scott's opinions on the grounds he is not qualified to render his opinions and his methodology is unreliable.[37] Hendrix's challenge to Scott's qualifications is directed at his opinions in the following six areas: "1) injury causation; 2) biomechanics (the application of mechanical principles on living organisms); 3) occupant kinematics (the movement of a body in a vehicle during a crash); 4) child safety seat design and performance; 5) the interaction between a child safety seat and a vehicle's airbag; and 6) forensic analysis of marks on child safety seats." Hendrix's position is that Scott is unqualified because he had no experience in any of these fields before becoming a professional expert witness. Hendrix also maintains that under Florida law a witness may not offer opinions on injury causation unless he is a qualified medical expert, which Scott is not. Evenflo's lengthy response may be generally summarized as follows: Scott is an engineer, and engineers apply the laws of physics, which are relevant to Scott's opinions; and also, Scott's experience gained during litigation consulting should not be discounted.

Scott's opinions are that Perryman was in his carrier in the front passenger seat; the seat was nearly or fully forward; the carrier was loosely restrained or completely unrestrained by the seat belt, with it being most likely completely unrestrained; the airbag deployed during the accident; the force of the airbag broke the carrier's shell; either

---

**35.** The metal locking clip may be optionally inserted by the consumer into the carrier for use in certain seat belt configurations.

**36.** Scott's opinions are presented to the court through an affidavit of July 31, 2007 (doc. 292–2, pp. 21–37), his report of March 3, 2008 (doc. 292–2), and his September 10, 2008, supplemental affidavit (doc. 344–2), which consists of sworn rebuttal testimony to the motion currently at bar.

**37.** The court will not seriously entertain Hendrix's contention that "Engineering Science" is a "dead science."

the shell or the airbag itself impacted the right rear of Perryman's head; the force of the airbag accelerated Perryman's head rearward; and Perryman's left forehead hit the seatback of the front passenger seat. Scott further concludes, on the basis of his own knowledge of medical studies, that the impact on the right rear of Perryman's head caused the hemorrhages around his brain, and Perryman's collision with the passenger seat caused the bruise on his left forehead. Scott also concludes that Perryman would have been more seriously injured if his head had been higher in the seat or if he had been a larger child. Finally, Scott asserts that "Perryman's autism and alleged syringomyelia are not related to the subject incident."

■ As an engineer with experience in occupant kinetics related to vehicle crashes, Scott is qualified to offer opinion as to whether, from a biomechanics standpoint, Perryman's injuries are consistent with those expected from an exploding airbag; however, even under the liberal standard for the qualification of expert witnesses, see *Leathers*, 233 F.R.D. at 692, Scott is not qualified to offer medical causation testimony, including that Perryman's head injuries caused a particular bleeding pattern but no brain injury; that Perryman did not have a serious head injury as a result of the accident; that Perryman's Autism Spectrum Disorder and syringomyelia did not result from the accident; and the possible cause of any medical condition suffered by Perryman. Scott is also not qualified to interpret Perryman's medical records or the existing body of medical literature relevant to Perryman's injuries.

Hendrix also challenges the methodology used by Scott to reach conclusions on the following subjects:

*a. Damage and marks on seats.* Evenflo's expert Van Arsdell conducted a test in which he exploded an airbag into a Discovery carrier; however, the carrier in that test did not shatter as dramatically as Perryman's. Van Arsdell offered explanations for the discrepancy in shattering intensity. Here, Scott also offers alternative hypotheses to explain

why the damage was not as severe. As with Van Arsdell, Hendrix states that Scott's alternative hypotheses are based on an unreliable methodology and should be excluded. Similarly, Hendrix argues that Scott's conclusions about the different markings on the test carriers and Perryman's carrier should be excluded for lack of a reliable methodology. Additionally, Hendrix contends that Scott's opinions should be excluded as speculative. Evenflo responds that excluding Scott's opinions on methodology grounds would impermissibly shift the burden of proof to Evenflo.[38] Evenflo also argues that Hendrix cannot reasonably require it to test a "nearly infinite number of possibilities."

As noted, Van Arsdell ran separate sled tests on the opposing theories in the case as to where the carrier was located at the time of the accident. Interpreting the test results, Scott found that "[t]he damage to the shell of [Van Arsdell's test] seat was less extensive than the damage to Master Perryman's infant seat ...." Scott attempts to explain the difference in damage by offering three alternative factual scenarios: (1) that Perryman's CRS was "not restrained by the vehicle's seatbelt"; (2) that "the seat belt was not snug"; and (3) "the right front seat was in a more forward position." Scott states that these scenarios could have operated in conjunction to produce the damage, but Scott performed no testing of these scenarios. As with Van Arsdell's and Reitman's similar alternative hypotheses, there are no facts in the record to support Scott's hypothetical scenarios, particularly his suggestion that "it is most likely that ... Perryman's infant seat was not restrained" at all. These opinions will be excluded.

■ *b. Perryman's injuries.* Scott opines that, had Perryman been a larger infant or positioned higher in the seat, he would have sustained greater injuries because he would have been in the path of the deploying airbag. Scott performed no testing of this hypothesis, but, more importantly, the court finds it irrelevant whether Perryman would have sustained greater injuries in

---

**38.** Evenflo's argument regarding the burden of proof is rejected. The court obviously understands Hendrix to have the burden of proof on

causation and Evenflo the burden to show that Scott's methodology is reliable. *See Frazier*, 387 F.3d at 1260.

the accident if he had been a larger child. This opinion will be excluded.

■ *c. Drop test.* Scott performed a drop test in which he loaded a carrier with a 22–lb. dummy and dropped it onto a concrete floor at a height that, according to Scott, would have approximated the same forces Perryman allegedly sustained under Hendrix's theory that he was located in the rear seat. Hendrix objects to conclusions from this test on the basis that Scott's test carrier was made from a different polypropylene resin than the one used in Perryman's carrier. Scott has not shown how test results from a seat made from a different resin will produce a sufficiently reliable conclusion.[39] Scott's drop test and related conclusions will be excluded.

Hendrix's motion to exclude the opinions of William Scott was granted in part and denied in part.

### 7. Geoffrey Germane[40]

Dr. Geoffrey Germane, an expert for Evenflo, is a mechanical engineer specializing in accident reconstruction with a B.S., M.S., and Ph.D. in engineering. Germane assisted with designing the sled tests performed by Van Arsdell, and Evenflo seeks to admit his conclusions about the tests, including that the accident was caused by Hendrix's inattention to driving; the collision occurred at relatively low speeds; "[d]amage to the Evenflo child restraint indicates an impact ... more severe than expected for a properly located and secured restraint in a low speed impact"; the damage to Perryman's carrier "could not occur with it either secured to or not attached to the middle seat in the vehicle"; and the abrasions on the carrier are consistent with interaction from a deploying airbag. Hendrix seeks to exclude Germane's opinions on: "1) occupant kinematics; 2) fracture characteristics of a child safety seat;

3) child safety seat design and performance; 4) the interaction between a child safety seat and a vehicle's airbag; and 5) forensic analysis of marks on child safety seats." Hendrix argues that Germane is not qualified to offer opinions in these areas, and also objects to the methodology applied by Germane to reach his conclusions.[41] Hendrix also challenges Germane's opinion as to the position of the passenger seat. Hendrix, however, concedes that Germane's opinions as to "pure accident reconstruction" survive scrutiny under Rule 702.

■ As to qualifications, Hendrix argues that Germane's focus "throughout his career" has been in the fields of engine design and accident reconstruction, and although Germane is narrowly qualified to opine on accident reconstruction, he is not qualified to offer conclusions in any of the broader subject matter areas identified above. Evenflo responds that Germane is qualified in all areas identified, given Germane's extensive engineering background and long history of experience with accident reconstruction, his significant experience in kinematics, including teaching courses in kinematics at the university level, and his expertise with plastics. The court finds that Germane's education, training, and experience in accident reconstruction and kinematics qualify him to offer his opinions.

■ Hendrix's next challenge is to the methodology Germane used in concluding that Perryman's carrier was damaged by an exploding airbag. Hendrix complains that Germane reviewed only photographs of Perryman's carrier and the exemplar carriers used in the Exponent testing, rather than personally inspecting these modules. Hendrix points out that Dr. Reitman, another Evenflo expert, testified that the appropriate methodology is to "visually inspect" plastic cracks overall and in fine detail, implying

---

**39.** Evenflo complains that Hendrix has not shown how the changed resin makes the test unreliable. As noted, however, it is not Hendrix's burden to show the unreliability of the test; rather, it is Evenflo's burden to demonstrate its reliability. *See Frazier,* 387 F.3d at 1260.

**40.** His opinion is presented to the court through his March 3, 2008, engineering analysis report

(doc. 302–2) and his September 10, 2008, declaration (doc. 343–2).

**41.** Hendrix's motion also seeks exclusion of Germane's opinion under Fed.R.Evid. 403; however Hendrix does not address this issue in her memorandum, so the court does not consider this part of her motion.

that Reitman would reject Germane's method of analyzing the marks. According to Evenflo, however, there is no legal requirement for an expert to personally observe the object of his opinions. *See Peteet v. Dow Chem. Co.,* 868 F.2d 1428, 1432 (5th Cir.1989). Evenflo also points out that Hendrix's expert, Dr. Benedict, also relies on photographs for his conclusions.

An expert may base his opinion on facts if they are the type of evidence "reasonably relied upon by experts in the particular field." Fed.R.Evid. 703. The court finds that photographs of Perryman's carrier and the test carriers are the type of evidence on which accident reconstruction experts such as Germane reasonably rely. As a practical matter, the damage to Perryman's carrier was severe—as Hendrix repeatedly point outs in her memoranda, fracturing into a half-dozen pieces—so photos of test results would clearly disclose the presence or absence of such dramatic fracturing. As to more subtle details, such as the blurred, melted letters or witness marks that Germane and other experts have opined about, it may be true that this information is detectable only upon personal inspection and cannot be captured by photography.[42] This, however, is a matter for Hendrix on cross-examination of Germane. Finally, as to Hendrix's argument that Germane lacks a basis to opine as to the position of the passenger seat, the court finds, as it did with Van Arsdell, there is a sufficient factual basis in the record for this opinion.

Hendrix's motion to exclude the opinions of Geoff Germane was denied.

### 8. *Edward Hoffman*[43]

Dr. Edward Hoffman is a medical causation and damages expert for Hendrix. Hoffman holds an M.D. from the University of Tennessee Center for Health Sciences, and is board-certified in the pediatric subspecialties of developmental-behavioral pediatrics and neurodevelopmental disabilities. He has a clinical practice in Overland Park, Kansas.

Dr. Hoffman opines that Perryman's autism spectrum disorder (ASD) and syringomyelia stem from the injuries he sustained in the accident and further that Perryman's syringomyelia is "likely to be progressive, resulting in additional spinal cord injury" which may prove debilitating.

▇ Specifically, Hoffman explains his conclusion that the accident resulted in Perryman's ASD and syringomyelia as follows:

First, that the brain, including the cerebellum, is actively developing during the perinatal/neonatal age that the injury occurred. Second, that this active brain development particularly includes developing connections between the cerebellum and different regions in the cortex. Third, that abnormalities in the cerebellum, and in the connections between the cerebellum and the cortex, are strongly linked to autism. Fourth, that the presence of syringohydromyelia presupposes abnormal cerebral spinal fluid pressure around the cerebellum at the site of the obex and foramen magnum. Fifth, that neither syringohydromyelia nor borderline Chiari I abnormalities were present when Gatlin was age 2 weeks and were certainly not present in utero when the target ultrasound was performed. Sixth, that hydromyelia is almost always associated with hydrocephalus, which Gatlin has never had, and Dr. Zimmerman's opinion that Gatlin does have hydromyelia goes against the clinical records in this case and against the accepted knowledge about the differences between hydromyelia and syringomyelia. Seventh, that the perinatal and neonatal intensive care follow-up literature does support the association between injury to the developing brain, including traumatic brain injury, and later occurrence of autism spectrum disorder. Eighth, that Gatlin did experience ... enough head injury to cause, among other things, a forehead bruise, irritability, poor feeding, reduced opening of left eye, subarachnoid and subdural hemorrhage, and

---

42. At deposition, Germane testified, "I can tell melted plastic when I see it."

43. His opinions are offered through an initial report of December 14, 2007 (doc. 335–5) and a supplemental report of June 18, 2008 (doc. 335–6).

soft tissue swelling in the parietooccipital region as well as likely hyperflexion neck injury. Ninth, that taken together ... the sequence of injury to the brain, spinal cord, and surrounding tissues at that time then resulted in changes to CSF flow in the cervical cord and around the foramen magnum with subsequent development of syringohydromyelia and also related altered and impaired subsequent development of the cerebellum and cerebellar connections to the cerebral cortex resulting in autism *spectrum* disorder (not classic autistic disorder, although he approaches this). Tenth, [genetics is not the reason Perryman has ASD]. (Doc. 335–6, at 7–8.) [44]

From this explanation,[45] the court understands Hoffman's theory as follows: (1) in utero and immediately after the accident, Perryman showed no signs of syringohydromyelia or any congenital defects linked with hydromyelia, including no Chiari–I malformation; (2) the "sequence of injury to the brain, spinal cord, and surrounding tissues" directly led to changes in Perryman's cerebral spinal fluid (CSF) flow or pressure, which is shown or "presupposed" by the syringohydromyelia which Perryman subsequently developed;[46] (3) these CSF pressure changes also caused "related altered and impaired subsequent development of the cerebellum" and its connections to the cerebral cortex; and (4) the resulting "impaired subsequent development of the cerebellum" caused Perryman's ASD.

In reaching his conclusions in this case, Hoffman used a method known as "differential diagnosis," which involves essentially a medical process of elimination, whereby all possible causes of a condition are considered and ruled out one by one, leaving only one plausible cause remaining.[47] *See McClain*, 401 F.3d at 1252 (citing Mary Sue Henifin et al., *Reference Guide on Medical Testimony*, in Reference Manual on Scientific Evidence

44. This explanation appears in Hoffman's supplemental expert report, filed after his initial report and after his deposition. Hoffman's initial report stated only that:

6) [Perryman's] autism is not a result of a chromosome abnormality nor of Fragile X syndrome, nor of perinatal distress or insult, nor of neonatal illness. There is no sign nor other indication of prenatal or perinatal insult or other apparent etiology for his autism. My medical opinion is that his autism is a direct result of the injuries he sustained to his head and developing brain during the motor vehicle accident.

(Doc. 335–5, at 10).

Elsewhere, Hoffman appears to espouse an alternate, simplified theory that "injury to the developing brain, including traumatic brain injury," is associated with "later occurrence of autism spectrum disorder." To the extent that this is, in fact, an alternate theory of causation, the court has considered it and rejects it for the same reasons it rejects Hoffman's more detailed theory.

45. This is the only explanation of Hoffman's theory in the record. Hoffman was not deposed following submission of his supplemental report, and, as noted, at the parties' choice, his live testimony was not presented to the court at an evidentiary hearing.

46. Hoffman's report refers to the development of a syringohydromyelia, not syringomyelia. Hoffman later opines that Perryman has a syringomyelia. It is the lay understanding of this court, based largely on the arguments of the parties, that these are two separate conditions, so it is unclear to the court why Hoffman does not refer to syringomyelia here. The court is also unclear on the differences in etiology and whether Hoffman's theory is relevant to a diagnosis of syringomyelia at all. For purposes of evaluating Hoffman's methodology, however, the court will assume (as he apparently has) that syringohydromyelia and syringomyelia are one and the same.

47. Although Hoffman (and the parties) refer to Hoffman's approach as "differential diagnosis," the process Hoffman used is more aptly termed "differential etiology." *See McClain*, 401 F.3d at 1252. The court notes that the two terms are frequently confused by the legal profession, including the courts. Henifin, *supra*, at 443–44. Differential diagnosis, as used most often in the medical profession, is "defined for physicians as 'the determination of which of two or more diseases with similar symptoms is the one from which the patient is suffering, by a systematic comparison and contrasting of the clinical findings.'" *Kannankeril*, 128 F.3d at 807(quoting Stedman's Medical Dictionary 428 (25th ed.1990)). Differential etiology, in contrast, refers to a process for determining the cause, or etiology, of a known disease or condition by reviewing all possible causes and then examining the patient to rule out all causes until only one possible cause remains. *Id.* at 444. In this case, because Hoffman's focus was on the cause of Perryman's ASD, not its diagnosis, his opinion is based on differential etiology. Nonetheless, for consistency purposes, the court will refer to Hoffman's approach as "differential diagnosis."

443–44 (Fed. Judicial Ctr.2d. ed.2000)). Hendrix argues Hoffman's use of differential diagnosis to reach his conclusions in this case passes muster under *Daubert* and Rule 702 because differential diagnosis is "well-recognized and accepted" by the medical community as a scientifically reliable method for determining the cause or origin of a disease or medical condition. Hendrix is correct that, "[u]nder certain circumstances, circumstances that ensure reliability," differential diagnosis is recognized in the law as a useful and reliable tool for medical practitioners to determine the cause of an ailment. *McClain,* 401 F.3d 1233 at 1252; *see also Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 262 (4th Cir.1999) (collecting cases). However, under *Daubert* and Rule 702, it is not sufficient for an expert to merely adduce an opinion and label it "differential diagnosis;" as with all else in the *Daubert* realm, the expert's opinion that a causal relationship exists must be the product of verifiable, scientifically reliable methods. *McClain,* 401 F.3d at 1253.

The courts have established certain legal standards to ensure the reliability and logical correctness of an expert's differential diagnosis opinion. The expert must first compile "a comprehensive list" of *all* possible causes for the condition under consideration. *McClain,* 401 F.3d at 1253 (citing *Clausen v. M/V NEW CARISSA,* 339 F.3d 1049, 1057–58 (9th Cir.2003)). Second, he must show that *each* of the suggested causes is actually capable of causing the condition, by expert opinion "derived from scientifically valid methodology." *Hollander v. Sandoz Pharm. Corp.,* 289 F.3d 1193, 1211 (10th Cir.2002) (citing *Siharath v. Sandoz Pharm. Corp.,* 131 F.Supp.2d 1347, 1362–63

(N.D.Ga.2001); *McClain,* 401 F.3d at 1253). Next, after "listing possible causes," the expert must "eliminat[e] all causes but one." *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1044 (2d Cir.1995). Finally, and most significantly in this case, the expert must show through reliable evidence that the remaining cause was one of the causes "ruled in" by the expert as actually being capable of causing the condition. *See McClain,* 401 F.3d at 1253 (quoting *Clausen,* 339 F.3d at 1057–58 (" 'It is important to realize that a fundamental assumption underlying [differential diagnosis] is that the final, suspected "cause" … must actually be capable of causing the injury.' ")); *Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir.2007); *Ruggiero v. Warner–Lambert Co.,* 424 F.3d 249, 254 (2d Cir.2005); *Norris v. Baxter Healthcare Corp.,* 397 F.3d 878, 885 (10th Cir.2005); *Hollander,* 289 F.3d at 1211 (quoting *Siharath,* 131 F.Supp.2d at 1362–63 (" *'[A]fundamental assumption underlying this method [of differential diagnosis] is that the final, suspected "cause" remaining after this process of elimination must actually be capable of causing the injury.* That is, the expert must "rule in" the other suspected cause as well as "rule out" other possible causes. And, of course, expert opinion on this issue of "general causation" must be derived from scientifically valid methodology.' ")).[48]

### Hoffman's ASD opinion

Evenflo's primary challenge, and that which has garnered the most attention from the court, is to the differential diagnosis Hoffman performed to reach his conclusion that Perryman's ASD was caused by a brain injury he sustained during the accident.[49]

48. Accordingly, in this case, Hoffman must show by scientifically reliable means that traumatic brain injury generally can cause autism. In cases such as this, a distinction is often made between general and specific causation. As way of explanation, "[g]eneral causation is established by demonstrating, often through a review of scientific and medical literature, that exposure to a substance can cause a particular disease (e.g., that smoking cigarettes can cause lung cancer). Specific, or individual, causation, on the other hand, is established by demonstrating that a given exposure is the cause of an individual's disease (e.g., that a specific plaintiff's lung cancer was caused by his smoking)." Henifin,

*supra,* at 444. For purposes of evaluating the reliability of Hoffman's opinion, the court has considered general causation as a critical component of his differential diagnosis as to the cause of Perryman's ASD. See *Norris,* 397 F.3d at 885 (quoting *Hall v. Baxter Healthcare Corp.,* 947 F.Supp. 1387, 1413 (D.Or.1996) (" '[D]ifferential diagnosis *assumes* that general causation has been proven ….' ") (emphasis in original)).

49. Evenflo also objects to Hoffman's ASD opinion on the grounds that Hoffman is not qualified to render the opinion and the opinion lacks a proper foundation in the record. As to qualification, the court notes that Hoffman's

According to Evenflo, Hoffman's differential diagnosis is fatally flawed for several reasons, but most notably for his failure to "rule in" all suspected causes of ASD and to establish through scientifically reliable evidence that traumatic brain injury is capable of causing ASD and/or that Perryman's head injury did in fact cause Perryman's ASD. Hendrix argues in response that Hoffman's differential diagnosis as to the cause of Perryman's ASD is scientifically reliable because Hoffman " 'identified the cause of [Perryman's] medical problem by eliminating the most likely causes until the most probable cause [was] isolated,' " which was the brain injury Perryman suffered on the day of the accident. According to Hendrix, Hoffman considered several potential causes for Perryman's ASD, including genetics, congenital defect, and traumatic brain injury.[50] He then carefully studied Perryman's "entire prenatal and developmental history," including "a massive amount of medical and related information," and eliminated congenital defect and genetics as a cause of Perryman's ASD based on Perryman's amniocentesis test results, prenatal ultrasounds, manner of birth, chromosome test results, and "Fragile X testing" (a DNA test) results, all of which

were normal.[51] Hendrix maintains this extensive review was more than sufficient under *Daubert* to establish the reliability of his differential diagnosis. The court disagrees. As discussed more fully below, despite Hoffman's "self-professed differential diagnosis", the court finds his methodology seriously flawed; his opinion that Perryman's ASD stems from a brain injury suffered during the accident is not based on reliable, scientific reasoning. *See McClain*, 401 F.3d at 1253. (noting that "an expert does not establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient"); *see also Black v. Food Lion, Inc.*, 171 F.3d 308, 314 (5th Cir.1999) (explaining that "[An expert's] use of a general methodology cannot vindicate a conclusion for which there is no underlying medical support.").

In evaluating the specific differential diagnosis approach taken by Hoffman in this case, the court first notes that he failed to compile "a comprehensive list" of all possible causes of ASD. *McClain*, 401 F.3d at 1253. Collectively, the medical studies cited by Hoffman discuss scores of physical, nutri-

---

credentials are not seriously in dispute, and finds that, notwithstanding his lack of specialization in pediatric neurology and/or pediatric neuroradiology, as a medical doctor board certified in developmental-behavioral pediatrics and neurodevelopmental disabilities with a long-term clinical specialization in pediatric developmental disabilities, Hoffman is qualified to render opinion as to the medical cause of Perryman's developmental disabilities. *See Quiet Tech.*, 326 F.3d at 1342–43. Regarding a factual basis for Hoffman's opinion, the opinion is premised on Perryman having suffered a traumatic brain injury during the accident, which, according to Hoffman, ultimately led to his ASD. Evenflo argues there is no factual basis in the record to show that Perryman suffered any traumatic brain injury from the accident and thus the opinion cannot stand. The court disagrees. Medical evidence in the record confirms Perryman did suffer an injury to his head during the accident, which caused an intracranial hemorrhage in his brain. Additionally, the record contains the conclusion of Perryman's treating physician, Dr. Suhrbier, that Perryman "suffered damage to his brain" during the accident. Thus, to the extent Hoffman's theory of autism causation relies on traumatic brain injury as the triggering mechanism, there is factual support for it in the record.

**50.** Genetics is the "branch of science concerned with heredity." Stedman's Medical Dictionary 640 (25th ed.1990). A congenital defect is one "[e]xisting at birth ... which may be either hereditary or due to an influence occurring during gestation up to the moment of birth." *Id.* at 342. The parties have not provided the court with a working definition of "traumatic brain injury" and the court itself has been unable to locate one.

**51.** According to a journal article cited by Hoffman surveying hypothesized genetic causes of autism, Fragile X syndrome, or FXS, "is an X-linked genetic disorder that is significantly associated with autism and that is denoted by unusual facial features, macro-orchidism [large testicles] in adulthood, and cognitive impairment of variable severity." Muhle et al., *The Genetics of Autism*, 113 Pediatrics, May 2004, e472, at e474 (*available at* http://www.pediatrics.org/cgi/content/full/113/5/e472, last visited Jan. 27, 2009) (footnotes omitted) (doc. 335–32, at 4). This article supports a link between Fragile X syndrome and autism because, according to the survey, 30% of Fragile X patients are on the autistic spectrum (although the causal link does not work in both directions—there is no agreement on the number of autism patients with Fragile X). *Id.*

tional, environmental, and genetic factors that have been generally linked with autism, including family dynamics, perinatal injuries (*see* Leon Weisberg et al., Essentials of Clinical Neurology 240 (2d ed.1989)); the use of general anesthesia, forceps, or vacuum extraction during the birthing process (*see* Juul–Dam, *Prenatal, Perinatal, and Neonatal Factors in Autism, Pervasive Developmental Disorder–Not Otherwise Specified, and the General Population,* 107 Pediatrics, Apr. 2001 (*available at* http://www. pediatrics.org/cgi/content/full/107/4/e63, last visited Jan. 27, 2009)); twinning, childhood vaccination (*see* Boyle et al., *Prevalence and Genetic Epidemiology of Developmental Disabilities* in Genetics of Developmental Disabilities 724); the mother's use of prescription medications and/or illegal drugs during pregnancy, breech presentation during birth, newborn diseases such as rubella and cytomegalovirus, and even a particular birth month (*see* Stefanatos and Joe, *Autistic Disorder* in Textbook of Clinical Neuropsychology 21516) (describing multiple "observations of an excess of births of children with autism in the month of March"). Notably, within the genetics category alone, one study identifies as many as ninety-one different "candidate genes" potentially responsible for autism. Franck Polleux and Jean M. Lauder, *Toward a Developmental Neurobiology of Autism,* 10 Mental Retardation and Dev. Disabilities Research Rev. 303, 310–12, 309 (2004) (doc. 335–35, at 2). Although theoretically linked to autism, at least according to his own medical literature, Hoffman did not include these factors in his differential diagnosis in this case.

Hoffman's opinion is also flawed for the related reason that he fails to eliminate all potential causes but one. Obviously, by failing to include all of the causes currently theorized in the medical literature in his "comprehensive list" of the possible causes of ASD, Hoffman failed to "rule out" all possible causes but one. Moreover, Hoffman's claim that he ruled out genetics as a potential cause of Perryman's ASD based on Perryman's normal "Fragile X" tests ignores the possibility of other genetic conditions as a cause.[52] Given the plethora of genetic theories for autism, "ruling out" Fragile X as a possible cause of Perryman's ASD far from eliminates all genetic causes of his ASD, let alone the other multitude of factors that have been linked to autism or ASD.[53] *See Doe 2 v. Ortho–Clinical Diagnostics, Inc.,* 440 F.Supp.2d 465, 477–78 (M.D.N.C.2006) ("Although Dr. Geier apparently has considered a number of specific genetic disorders in performing his differential diagnosis, the Court finds that his failure to take into account the existence of such a strong likelihood of a currently unknown genetic cause of autism serves to negate Dr. Geier's use of the differential diagnosis technique as being proper in this instance.").

■ While either of these deficiencies seriously taints Hoffman's differential diagnosis, the most glaring flaw in Hoffman's methodology is his failure to show how, by "scientifically valid methodology," traumatic brain injury could ever be a possible cause of autism in anyone. *See Hall,* 947 F.Supp. at 1413. Absent a scientifically reliable basis for the opinion thattraumatic brain injury can cause autism Hoffman's differential diagnosis cannot be accepted by the court as

---

**52.** The record does not reflect any genetic testing on Perryman beyond the Fragile X testing.

**53.** Even Hendrix concedes that Fragile X testing identifies only "the *most common* genetic causes for autism." (Pl.'s Opp. to Mot. to Exclude Dr. Edward Hoffman, doc. 335, at 14) (emphasis added). Indeed, the article Hoffman cited describes a number of other possible genetic defects linked to autism, including tuberous sclerosis complex, neurofibromatosis, Angelman syndrome, Prader–Willi syndrome, and "[m]any other rare single-gene defects." Muhle, *supra,* at e474–75 (doc. 335–32, at 4–5). Thus, because of the existence of many other hypothe-

sized genetic links, exclusion of Fragile X does not rule out genetics as a cause of autism.

Moreover, the authors of the article note that "the total number of individuals who are on the autistic spectrum and have known genetic ... conditions is only a small percentage of the whole," and that "an association with autism is not universal." *Id.* at e475 (doc. 335–32, at 5). They note that "[t]he vast majority of individuals with autism do not have any 1 of these ... rare genetic causes" and that the total number of autism patients with any of these identified genetic conditions is "probably <10%." *Id.* Thus, all currently hypothesized genetic conditions as a whole are only weakly linked to autism. *Id.*

reliable.[54] *See McClain*, 401 F.3d at 1253 (" 'Expert testimony that rules in a potential cause that is *not* so capable is unreliable . . . .' ") (emphasis in original). This is because a reliable differential diagnosis assumes general causation has been satisfied, *see Norris*, 397 F.3d at 885, which in this case means that Hoffman's opinion regarding the specific cause of Perryman's ASD as traumatic brain injury cannot stand absent scientifically reliable data supporting a causal relationship between traumatic brain injury and autism in general.[55]

■ Hendrix claims Hoffman's general causation theory is reliable because he has offered "a detailed, step by step, clinical explanation, based in part on dozens of medical articles and studies, that the environmental factor here that triggered [Perryman's] ASD was his head injury." Hoffman's clinical explanation of the mechanism by which brain injury causes autism rests on several underlying propositions, all causally linked: (1) injuries or forces sustained during a head injury can cause CSF pressure changes; (2) such CSF pressure changes can impair the development of the cerebellum and its connections to the rest of the brain; and (3) that type of impaired development can lead to ASD. Each of these predicate theories must withstand *Daubert* scrutiny and be scientifically reliable. *See Domingo ex rel. Domingo v. T.K.*, 289 F.3d 600, 606 (9th Cir.2002) (explaining that studies cited by an expert in support of a theory of causation must provide reliable support for every necessary link in the theory); *see also Paoli II*, 35 F.3d at 745 (explaining that *"any* step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible"). In determining the scientific reliability of each proposition, the court may consider whether each: "(1) can be and has been tested; (2) has been subjected to peer review and publication; (3) has a high known or potential rate of error and standards controlling its operations; and (4) is generally accepted within the relevant scientific or technical community." *See Vargas v. Lee*, 317 F.3d 498, 500 (5th Cir.2003) (citing *Daubert*, 509 U.S. at 593–94, 113 S.Ct. at 2796–97).

■ As an initial matter, the court notes that Hoffman has conducted no testing or studies of his own, has presented no case reports and has instead relied on medical literature to support his general causation theory. Although medical literature can show that a particular theory has gained general acceptance in the relevant medical community, provided the literature offers reliable data in support, (*see e.g. McClain*, 401 F.3d at 1251), in this case, the court has thoroughly reviewed all of the materials cited by Hoffman for references that would support any of his three propositions, either individually or in combination, and finds nothing supportive.[56] None of the materials even mentions CSF pressure changes much less explain the resulting effects on the cerebellum, or discuss any link between abnor-

---

**54.** This is particularly critical given that Hoffman's general causation theory is outside the range of those that "medical doctors routinely and widely recognize as true, like cigarette smoking causes lung cancer and heart disease." *See McClain*, 401 F.3d at 1239, n. 5.

**55.** In other words, differential etiology cannot be used to prove general causation; general causation must be established first. *Lennon v. Norfolk and W. Ry. Co.*, 123 F.Supp.2d 1143, 1153–54 (N.D.Ind.2000) (holding that differential etiology cannot "speak to the issue of general causation" and that differential etiology "assumes that general causation has been proven for the list of possible causes it eliminates").

**56.** Hendrix argues outright that no medical literature or "research studies" are needed to prove causation or to support any medical opinion so long as it is derived through "the well accepted methodology of differential diagnosis." Hendrix is incorrect. Hoffman's professed use of the "differential diagnosis" approach does not magically eliminate his need to satisfy Rule 702 and the *Daubert* standard. While medical studies may not be required in every case, general causation must always be shown as part of a differential diagnosis, *McClain*, 401 F.3d at 1252, and medical studies are a widely accepted means to do so. Hendrix's false assertion is based on a misreading of certain cases which have recognized that "epidemiological studies" are not required to prove general causation so long as other sufficiently reliable data are present. See *Rider*, 295 F.3d at 1198. This may be true, *see Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 992 (8th Cir.2001); nonetheless, in this case, Hoffman has no other reliable data, such as case reports or even his own personal experience, that shows general causation.

mal cerebellar pressure and autism. There is also no indication in the record that Hoffman's propositions have been tested, subjected to peer review, have a high known or potential rate of error, or are generally accepted within the relevant scientific or technical community. Moreover, regarding Hoffman's ultimate theory that traumatic brain injury can cause autism, the court notes that while a vague link between prenatal or perinatal "injury" and autism has been hypothesized by *some* in the medical community, none of Hoffman's materials offers even a general explanation, let alone a reliable one, of the physiological process by which traumatic brain injury can lead to autism.[57] *See Black*, 171 F.3d at 314; *see also Vargas*, 317 F.3d at 501–02. Although Hoffman claims that the articles he cites support a "general theme that injury to the immature brain is causally associated with autism," the law requires more than a "general theme" to support causation—it requires a scientifically reliable connection. *See, e.g., Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292–94 (11th Cir.2005). While some extrapolations based on existing science are permissible, as explained more fully below, in this case there is "simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146, 118 S.Ct. at 519.

Hoffman's supplemental report cites several textbooks, but all of them are cursory and unhelpful. Hoffman cites one nineteen-year-old textbook for a short, unsupported passage: "Infantile autism is a syndrome most likely produced by multiple endogenous (perinatal injuries, biochemical abnormalities) and environmental factors (family dynamics: cold and detached parents)."[58] Weisberg, *supra*, at 240. This work offers no arguable support for Hoffman's general causation the-

ory and contains no citations to other supportive authority. Hoffman cites another textbook for the statement: "Perinatal injuries and prematurity are associated with autism with greater than chance frequency." M. Kinsbourne and F.B. Wood, Disorders of Mental Development in Child Neurology 1116 (7th ed.2006) (endnotes omitted). Other than a cursory, non-specific reference to perinatal injuries, nothing in this statement supports Hoffman's theory that traumatic brain injury in a newborn can cause autism. There is no mention, much less discussion, of the specific perinatal injuries contemplated to be associated with autism, and, more importantly, no explanation of a process by which these injuries could produce autism. Moreover, the authors' reference to prematurity suggests a focus different from Hoffman's theory of trauma as a precipitating event,[59] and Hoffman offers no explanation for this, nor does he attempt to distinguish prematurity in the context of his own theory.[60] In sum, this single sentence falls far short of providing a scientifically reliable basis for Hoffman's theory. A third textbook cited by Hoffman is equally deficient in its support, offering only the following statement with no citations: "Theories of causation have also centered on a variety of other possibilities, especially pre- or perinatal brain injury." Dalton et al., *Pervasive Developmental Disorders and Childhood Psychosis* in Nelson Textbook of Pediatrics 93 (17th ed.2004). The cited reference is cursory, drawn from a textbook chapter section of less than two pages that devotes only a few hundred words to causation and almost nothing to traumatic injury; it also states that "the literature on brain structure and function in autistic children is conflicting." This does not support Hoffman's theory. In sum, none of these works come close to providing useful evidence of a definitive causal link between traumatic head

---

57. The materials cited make broad, general references to "injuries," often without defining that term, occurring sometime in the prenatal phase (generally, before birth) and/or the perinatal phase (generally, a period of time from before birth until a few weeks after birth, although the authors did not agree on a definition). Hoffman failed to include an explanation of how the studies are relevant or analogous to his theory, and the court could not see the relevance or make the analogy on its own.

58. Curiously, although they appear in a textbook cited by him, Hoffman does not include these potential causes in his differential diagnosis.

59. The works cited by the authors do not appear in the record.

60. Perryman was full-term at birth.

injuries and autistic disorders, and none provide even marginal support for Hoffman's theory of a relationship between abnormal CSF pressure and problems with cerebellum development, leading to autism.

Hoffman also cites medical studies in support of his theory, but the studies he cites are at best attenuated and at worst irrelevant. For instance, Hoffman cites one study showing that infants with newborn encephalopathy (NE) were 5.9 times more likely to have ASD than infants in a control group.[61] Badawi et al., *Autism following a history of newborn encephalopathy: more than a coincidence?*, 48 Dev. Med. & Child Neurology, Feb. 2006, at 85 (doc. 335–33, at 2). This study gives no explanation of the relevance, if any, of NE to trauma-induced brain injury in a newborn, and to the extent there is any link or relationship among NE, CSF pressure abnormalities, and cerebellum development problems the study does not discuss it, and Hoffman does not explain it. Also, the authors acknowledge some significant limitations in their study, including the authors' failure to distinguish among preterm and term infants and account for possible recall bias by participants.[62] Moreover, the authors acknowledge "a previously undescribed association between NE and ASD," which presumably means there is no scientific consensus on the theory, and there may never be one if further studies disprove it.

In another study cited by Hoffman, conducted at two separate neo-natal intensive care units, researchers compared the autism screening results of infants with cerebellar injury (study group) to those without cerebellar injury (control group) and concluded that 37% of infants in the study group tested positive in autism screening tests, versus 0% in the control group. This study, however, was limited to infants born earlier than 32 weeks, all of whom showed "echodense lesions" in the cerebellar hemispheres or the vermis on MRI after birth. Limperopoulos et al., *Does Cerebellar Injury in Premature Infants Contribute to the High Prevalence of Long–Term Cognitive, Learning, and Behavioral Disability in Survivors?*, 120 Pediatrics, Sep. 2007, at 584 (*available at* http://pediatrics.aappublications.org/cgi/content/full/120/3/584, last visited Jan. 27, 2009) (doc. 335–17, at 2). Nothing in the study shows that the preterm infants suffered any head trauma, and Hoffman fails to explain the link between the lesions detected on the MR images of the infants studied and his CSF pressure/cerebellum development theory. Also, as noted by the authors, the simple autism screening tests used in the study did not affirmatively diagnose autism disorders and further testing would be necessary before a diagnosis could be confirmed. Another study examined the neurologic outcomes of children who suffered brain injury and concluded that autism was a possible outcome. *See* Barlow et al., *Late Neurologic and Cognitive Sequelae of Inflicted Traumatic Brain Injury in Infancy*, 116 Pediatrics, Aug. 2005, at e174 (doc. 335–30, at 2). Although on initial review of Hoffman's discussion of this study in his supplemental report the court assumed the study would provide some support for his general causation theory, in reviewing the study itself the court concluded otherwise. Notably missing from Hoffman's discussion is the fact that the study group contained only children whose brain injuries had been intentionally inflicted by another person; the sample size of the study group was only twenty-five and there was no control group; and only one child out of the twenty-five in the study group developed autism. Further, and significantly, nothing in the study purports to show or explain the physiological process by which brain injury produces autism. *See Black*, 171 F.3d at 314.

---

**61.** Encephalopathy is defined as "any disease of the brain." Stedman's Medical Dictionary 508 (25th ed.1990).

**62.** "Recall bias" refers to the human tendency, when confronted with an rare outcome, such as the development of autism, to recall with greater frequency or clarity events which may explain the outcome. *See, e.g., McBride v. Merrell Dow and Pharm. Inc.*, 717 F.2d 1460, 1468 (D.C.Cir. 1983) (explaining that, in Bendectin birth defect litigation, recall bias may affect studies because "[w]omen with normal babies may forget they took the drug and those with malformed babies may be more likely to remember—or vice versa").

Hoffman cites other materials, but they are similarly speculative, attenuated, or are otherwise limited by the authors' own admission that the studies cannot be used to show causation.[63] *See McClain,* 401 F.3d at 1247, 1251 (describing similarly self-limited studies). None of Hoffman's materials provides reliable support for the theory that head injuries, CSF pressure changes, or cerebellar abnormalities can lead to autism. Instead what is clear to the court from its review of the record in this case is that "neither [Hoffman] nor medical science knows the exact process that results in [autism] or the factors that trigger that process." *Vargas,* 317 F.3d at 501 (quoting *Black,* 171 F.3d at 314) (explaining further that " '[a]bsent these critical scientific predicates, for which there is no proof in the record, no scientifically reliable conclusion on causation can be drawn.' "). Hoffman conceded as much in deposition:

Q. Dr. Hoffman, what scientific research do you have to support your opinion that traumatic brain injury or closed head injury caused his autism?

A: ... If you ask what scientific basis, and what I was looking for was am I just coming up with this myself, or are other people seeing this, too, and I reassured myself that other people are and it's starting to show up in the literature. There is not, that I am aware of, like a major chapter or major article in the New England Journal saying this is a primary cause.

...

Q: Let me take back what you said here or go over what you said.

A. Just to expand just very briefly on that answer. Since no one knows what causes autism unless you identify known genetic chromosome anomalies, when you take the vast majority since we don't know—I mean, the medical scientific community does not know. There is a lot of speculation and a lot of studies, but we don't know.

Q: Don't know what?

A: What causes autism in general.

(Hoffman Depo., doc. 315–51, at 12022.) Given that identifying a cause of autism does not appear to be within the realm of current medical science, it is no wonder Hoffman did not compile a list of all possible causes and eliminate all but one as part of his differential diagnosis. *See Black,* 171 F.3d at 313. It is also no surprise that Hoffman's medical literature does not support his theory. (*See* Hoffman Depo. 122 ("I mean, the medical scientific community does not know. There is a lot of speculation and a lot of studies, but we don't know [what causes autism in general].")). Although medical science may in time reliably establish a known cause(s) of autism, until such time as medical science understands the physiological process by which autism develops and how the process occurs, the law cannot impose liability for autism. *See Black,* 171 F.3d at 314; *see also Vargas,* 317 F.3d at 503 (quoting *Daubert,* 509 U.S. at 597, 113 S.Ct. at 2798–99 (footnote omitted) (reminding district courts that " '[I]n practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for the particularized resolution of legal disputes.' ")).

In sum, Hoffman's ASD opinion is based on faulty logic. He assumes that because he eliminated other possible causes of autism from his differential diagnosis, even though

---

**63.** Each author to address the cause of autism was careful to circumscribe his opinions and acknowledge that autism has no known cause. *See* Dalton, *supra,* at 93 ("The cause of autism is multi factorial .... What is actually inherited is not entirely clear...."); Juul–Dam, *supra,* at 1, 6 ("no consistently identified factors have been shown"; "no single complication or cluster of complications is responsible for the development of autism"; "[p]erhaps additional research will confirm certain pre-, peri-, and neonatal associations that could be used to generate a high-risk historical profile" to improve tools to detect autism); Muhle, *supra,* at e472 ("autistic disorder ... [is] not linked to any particular genetic or nongenetic cause"); Badawi, *supra,* at 85 (noting "[a]utism is a complex syndrome without a uniform aetiology" and speculating that "obstetric factors" may be related to autism but stating "it is unknown ... if they play any causal role"); Polleux and Lauder, *supra,* at 303 ("[t]he etiology of autism is poorly understood").

admittedly neither he nor medical science knows the "real" cause, the cause of Perryman's ASD must be the head injury he sustained in the accident. The gaps in Hoffman's logic and flaws in his methodology are obvious, as noted; suffice it to say "[t]his is not an exercise in scientific logic but in the fallacy of *post-hoc propter-hoc* reasoning, which is as unacceptable in science as in law." *Black*, 171 F.3d at 313; *see Paoli II*, 35 F.3d at 745 (recognizing that critical gaps in an expert's methodology make it wholly unreliable). Hoffman's ASD opinion is unreliable and thus will not be admitted at trial.

### Hoffman's syringomyelia opinion

 Evenflo disputes that Perryman has a syringomyelia, but argues that even if Perryman does have this condition, Hoffman's differential diagnosis for syringomyelia is unreliable because he does not consider all possible causes of the condition, namely that the cause of Perryman's spinal cyst is idiopathic.[64] According to Evenflo, there are four possible causes of a syringomyelia, on which all the medical experts in this case agree: congenital defect, tumor, trauma, and idiopathic cause. Evenflo complains that Hoffman rules out congenital defect and tumor, then "jumps to the conclusion" that trauma is the only possible cause without considering idiopathic cause. In response to Evenflo's criticism, Hendrix states that although "idiopathic cause," along with congenital cause, was suggested as a possible cause by one of Perryman's treating physicians, Dr. David Pincus, Hoffman specifically discounted Pincus' opinions based on a lack of supporting data. According to Hendrix, in Hoffman's view, "[i]diopathic just means [Pincus] has not assigned a likely etiology." Hendrix also argues that Hoffman may properly draw the conclusion that trauma caused Perryman's syringomyelia based largely on the deposition testimony of Evenflo's expert neuroradiologist, Dr. Zimmerman, in which Zimmerman admitted that a syringomyelia caused by trauma may not appear for several years following the trauma. Hendrix also notes that her expert, Dr. Shanahan (whose opinions Evenflo does not challenge) and Perryman's treating physician, Dr. Suhrbier, have both concluded that Perryman's syringomyelia is the result of trauma sustained in the car accident.

Hoffman considered Pincus' opinion that the cause of Perryman's syrinx[65] is most likely congenital or idiopathic and rejected it based on a lack of data to support it. He also considered the radiographic scans taken of Perryman in utero and on the day of the accident and the fact that no evidence of a syringomyelia or any congenital defect possibly related to a syringomyelia was present, from which he concludes that trauma is the most likely cause. The court finds Hoffman's consideration of Pincus' opinion and rejection of it sufficient to satisfy his responsibility, for purposes of a differential diagnosis, to consider all possible causes of syringomyelia. Unlike ASD, the experts do not suggest that the cause of syringomyelia is generally unknown and the court has not been presented with any medical literature to that effect. To the contrary, the experts in the case all agree there are specific known causes of syringomyelia, namely trauma, tumor, and congenital defect. Consequently, the court finds Pincus' reference to an "idiopathic cause" to be only a suggestion that the cause of Perryman's syrinx may not be identifiable. The court also finds there is sufficient factual support in the record to support Hoffman's opinion through Zimmerman's deposition and Shanahan's report.

### Hoffman's future damages opinion

 Evenflo claims that Hoffman's opinion regarding Perryman's need for medical care and treatment in the future based on his syringomyelia is unduly speculative. In his initial report, Hoffman states that syringomyelia is an uncommon disorder with an unpredictable course that is "likely to result in orthopedic and functional, possibly severe,

---

**64.** Idiopathic means "agnogenic; denoting a disease of unknown cause." Stedman's Medical Dictionary 762 (25th ed.1990).

**65.** A syrinx is a "pathologic tube-shaped cavity in the brain or spinal cord." Stedman's Medical Dictionary 1545 (25th ed.1990). Thus, the experts' generic reference to a syrinx in this case could refer to either a syringomyelia, syringohydromyelia, or hydromyelia.

neurologic deterioration decades into the future." Hoffman opines that Perryman's syringomyelia is "post-traumatic, has evolved, and is likely to be progressive, resulting in additional spinal cord injury" which could yield "scoliosis, sensory abnormalities, and arthropathy, but additional paralysis is a serious concern." Hoffman also opines that deterioration in Perryman's condition could lead to the need for more frequent medical attention, including monitoring, hospitalization, and surgery, and also result in a reduced life expectancy for Perryman of up to thirty years. Evenflo argues that no deterioration has taken place and thus it is speculative to opine about Perryman's possible need for related future medical care and treatment. Evenflo also notes that even Hoffman concedes that Perryman could lead an entirely asymptomatic life. Hendrix responds to all of Evenflo's arguments in a single footnote, which the court excerpts here: "This is not a *Daubert* attack, .... The question is one of evidentiary foundation, not the reliability of Dr. Hoffman's methodology—which, as shown *supra*, is both scientific and easily in compliance with *Daubert and* Rule 702. Plaintiffs will lay what they believe to be the necessary foundation at trial to get evidence of future damages for the syringomyelia into evidence[,]" and if Evenflo disputes the foundation, it should object at that time.

Although the factual support on which Hoffman relies for his opinion is far from overwhelming, the court is satisfied that his opinion is adequately supported by the record. First, Dr. Shanahan's opinion that the trauma of the accident caused Perryman's syringomyelia is unchallenged. Second, Hoffman cites Barkovich, Pediatric Neuroimaging (3d ed.2000), for the proposition that patients with traumatic syringomyelia commonly experience a latent period of 20 to 30 years before the onset of symptoms.[66] The court finds that, taken together, Shanahan's unchallenged opinion and the statement above from an authoritative medical text provide adequate support for Hoffman's opinion.

Evenflo's motion to partially exclude the opinions of Edward Hoffman was granted in part and denied in part.

### 9. David Suhrbier[67]

Dr. David Suhrbier is a board-certified pediatric neurologist at the Child Neurology Center of Northwest Florida in Pensacola, and has been Perryman's treating physician since April 2005. Dr. Suhrbier offers the opinion that Perryman's ASD and syringomyelia were caused by the injuries he sustained in the accident. Evenflo argues it will be prejudiced by admission of Suhrbier's expert opinion on these subjects because Suhrbier was not disclosed as an expert witness and did not produce a Rule 26 report. Also, Evenflo contends Suhrbier's opinion is not reliable because it is not based on accepted medical science. Hendrix responds that Suhrbier was disclosed as an expert witness, and further that Evenflo cannot now claim surprise because it deposed Suhrbier once and passed up a second opportunity to depose him. Further, Hendrix maintains it was not necessary to disclose Suhrbier as an expert witness, let alone have Suhrbier produce a Rule 26 report, because he was a treating physician and can properly testify as to his treatment of Perryman and conclusions he reached based on that treatment. Finally, Hendrix responds that Suhrbier does have a reliable scientific basis for his opinions, because he considered medical records, his own impressions, and other materials before him, and used differential etiology to rule out other potential causes of Perryman's autism and syringomyelia.

■ Initially, the court notes that at trial treating physicians may offer medical opinion regarding their care and treatment of a patient, including their diagnoses of a patient's medical conditions and causes of those conditions, without production of an expert report. *See* Fed.R.Civ.P. 26(a)(2)(B) and 1993 Advisory Committee Notes ("A treating physician ... can ... testify at trial without any requirement for a written report"); *Salas v. United States*, 165 F.R.D. 31, 33 (W.D.N.Y. 1995); *Smith v. Jacobs Eng'g Group, Inc.*,

---

**66.** The court notes that Evenflo's own expert, Dr. Epstein, also relies on this text for his opinions.

**67.** Hendrix has introduced Suhrbier's affidavit of September 9, 2008 (doc. 334–8).

No. 4:06cv496–WS, 2008 WL 2781149, at *2 (N.D.Fla. Apr.18, 2008). To be admissible, however, the physician's opinions still must be based on a scientifically reliable methodology. *Lamere v. N.Y. State Office For The Aging,* 223 F.R.D. 85, 88 (N.D.N.Y.2004) (concluding that "a treating physician's testimony is governed by Rule 702"); *Cunningham v. Masterwear, Inc.,* No. 1:04CV1616–JDT–WTL, 2007 WL 1164832, at *9 (S.D.Ind. Apr.19, 2007) (holding that "Rule 702 requires that any opinion of [a treating physician] meet the requirements of reliability and relevance" and excluding physician who testified as to causation without meeting *Daubert* standard).

■ In this case, Suhrbier's ASD opinion and the methodology on which it is based suffer from the same deficiencies as Hoffman's and will likewise be excluded.

■ Evenflo also challenges the methodology used by Suhrbier to reach his syringomyelia opinion and also points out that, at deposition, Suhrbier conceded he had no factual evidence to indicate that Perryman's syringomyelia was the result of anything other than congenital or idiopathic causes. Evenflo, therefore, argues Suhrbier cannot now offer the contrary opinion that the syringomyelia was caused by trauma from the accident. The court disagrees and finds Suhrbier's methodology reliable. As did Hoffman, Suhrbier performed a differential diagnosis in which he considered Perryman's medical records and other information in making his syringomyelia diagnosis; he also appropriately considered the causes of syringomyelia and determined that trauma was the most likely cause. As noted, all of the medical experts in this case agree that trauma can cause a syringomyelia. The fact that Suhrbier may have testified differently at deposi-

tion goes to the weight, not the admissibility, of his trial testimony.

As a result, Evenflo's motion to partially exclude the testimony of David Suhrbier was granted in part and denied in part.

### 10. *Robert Zimmerman*[68]

Dr. Robert Zimmerman, a medical expert for Evenflo, is a pediatric neuroradiologist and the Chief of the Pediatric Neuroradiology Section of The Children's Hospital of Philadelphia. In summary, Zimmerman's opinion is that Perryman's spinal cyst is a congenital condition known as a hydromyelia, which, according to Dr. Zimmerman, is distinct from a syringomyelia. Zimmerman bases his opinion on Perryman's MRI and CT images taken immediately after the accident in 2002, and MRI images taken in 2005, 2006, and 2007. Specifically, Zimmerman's impression is that while the 2002 images do show some evidence of bleeding in the subarachnoid space of Perryman's brain, there is no evidence of a parenchymal brain injury[69] or any brain malformation. Zimmerman also notes evidence of a Chiari I malformation on the 2005 MRI, which is a congenital brain defect of the cerebellar tonsils, in which the tonsils migrate in a caudal direction, which sometimes leads to the formation of hydromyelia.[70] Zimmerman notes further that the cerebellar tonsils appeared to remain in their caudal position on the 2007 MRI. According to Zimmerman, the cause of Perryman's Chiari I malformation is idiopathic.

■ Hendrix moves to exclude Zimmerman's opinion that Perryman has a hydromyelia, not a syringomyelia. Hendrix complains that Zimmerman will not reveal the methodology for his opinion until trial, resulting in "ambush" because her counsel will not

---

68. His opinion is presented to the court through his February 25, 2008, initial report (doc. 247–24); a July 31, 2008, supplemental report (doc. 298–8); and a September 5, 2008, supplemental affidavit (doc. 338–2).

69. Parenchymal refers to the "distinguishing or specific cells of a gland or organ." Stedman's Medical Dictionary 1139 (25th ed.1990). In lay terms, the court understands this to mean that the bleeding did not affect the main functioning of the brain but was merely ancillary.

70. In lay terms, the court understands "Chiari I malformation" to mean that part of the cerebellum is compressed against the spinal cord through the opening from the skull into the neck, causing abnormal flows of cerebral spinal fluid, which may cause hydromyelia. *See, e.g.,* American Syringomyelia Alliance Project, Inc., *What is the Chiari Malformation?,* http://www.asap.org/chiari-malformation.html (last visited Jan. 27, 2009).

have had the ability to examine his methodology. She objects that Zimmerman bases his opinion on nothing more than his experience and his "ability to interpret the [radiographic] images," making his methodology untestable and unreliable. Hendrix also seeks exclusion of Zimmerman's opinions under Rule 403. Evenflo responds that in reaching his conclusions Zimmerman relied on his experience as a practicing radiologist for 34 years; his education, including an M.D. from Georgetown University; several medical articles and studies, including four that he co-authored and marked at deposition; textbooks; and prior medical research including an autopsy.

The court rejects Hendrix's challenge to Zimmerman's methodology. Although the court is mindful that qualifications and reliability are separate prongs of the Rule 702 analysis which courts "must take care not to conflate," *Quiet Tech.*, 326 F.3d at 1341, the court recognizes this case as one in which there is clear "overlap" between an expert's qualifications and the reliability of his methodology. *Id.* Zimmerman's opinion is reliable because it is based on a routine process he and other professionals in his field employ regularly; i.e., the interpretation of radiologic and computer tomographic studies based on education, training, and the exercise of professional judgment. Nothing Zimmerman has disclosed appears outside the mainstream of radiology, which is an accepted medical science with demonstrable reliability and a testable error rate; a challenge to radiology itself would be unfounded.

Hendrix's Rule 403 objections also are without merit. Her first Rule 403 objection to Zimmerman is that his "refusal to disclose his ... methodology until trial means that plaintiffs will be hearing it for the first time during his direct examination. This will un-

doubtedly result in extensive objections from plaintiffs ...." Hendrix claims that such objections would have to be addressed outside the presence of the jury, and "essentially result in a *Daubert* type hearing during the trial itself." Because his methodology has been amply disclosed, and is otherwise obvious, this concern is unfounded. Hendrix's other objections under Rule 403 are that the jury may give great credibility to Zimmerman's testimony on account of his "impressive credentials," and that Hendrix currently anticipates the need to call rebuttal witnesses to oppose Zimmerman's testimony. Neither objection merits discussion.

Hendrix's motion to exclude the opinions of Robert Zimmerman was denied.

### 11. Mark Epstein[71]

Dr. Mark Epstein, an expert for Evenflo, is a board-certified pediatric neurologist. He serves as the Medical Director of the Dan Marino Center at Miami Children's Hospital, in Weston, Florida. He holds an M.D. from Mount Sinai School of Medicine. In summary, Epstein's opinion is that Perryman's ASD is not the result of a head injury sustained during the accident and is more likely explained by genetics, which he submits is supported by the fact that Perryman's older brother, Tanner Perryman, has a lesser form of autism. Epstein also opines that trauma very rarely causes syringomyelia; that Gatlin Perryman did not suffer a spinal cord injury and thus trauma-induced syringomyelia is very unlikely; and that Gatlin Perryman has a hydromyelia that is most likely idiopathic or congenital.

Hendrix seeks complete exclusion of Epstein's opinions on the grounds that his methodology is a "novel and highly controversial methodology known as 'Evidence Based Medicine,'" or EBM.[72] Hendrix supports her

---

71. His opinion is presented to the court through a February 28, 2008, initial report discussing both autism and syringomyelia/hydromyelia (doc. 304–2); a June 1, 2008, supplemental report concerning Gatlin Perryman's brother, Tanner (doc. 304–3); an August 2, 2008, second supplemental report nearly entirely devoted to autism (doc. 304–11); and an October 2, 2008, sworn declaration prepared specifically in response to this motion and filed out of time by permission of the court (doc. 400–2).

72. It appears that significant controversy does surround "Evidence–Based Medicine" (EBM). The court reaches this conclusion based on its review of Epstein's declaration, and certain medical journal articles attached to plaintiff's memorandum in support of excluding Epstein. EBM counsels a doctor who has a known diagnosis and who is evaluating treatment options to rely on medical studies evaluating the effectiveness of those treatments. In EBM, the studies are

objection to the use of EBM with the affidavit of Dr. Stephen Hamburger, in which Hamburger outlines the strong opposition by some in the medical community to the use of EBM.[73] Hendrix also seeks exclusion under Rule 403 because she insists that to resolve the "raging" controversy over EBM in this case would require a "major courtroom battle" that would confuse and distract the jury from the real issues in the case.

Evenflo responds that Hendrix's challenge to Epstein's methodology stems from a few references in Epstein's initial report that mention evidence-based medicine, which are taken out of context.[74] Evenflo insists that Epstein did not use the purportedly objectionable methodology Hendrix calls "EBM" in reaching his conclusions in this case, and after oral argument offered a sworn declaration from Epstein explaining his true methodology. Evenflo also argues that Hamburger's opinion is irrelevant because Hamburger does not know Epstein and did not review the medical case files. Further, Evenflo notes that Hendrix could have questioned Epstein on the EBM methodology at either of two depositions held subsequent to Epstein's initial report, and failed to do so.

As an initial matter, all of Epstein's opinions regarding the cause of Gatlin Perryman's Autism Spectrum Disorder, including opinions related to Tanner Perryman, will be excluded as not relevant based on the court's decision excluding Hoffman's opinion on ASD.

▮ Regarding Epstein's methodology, Epstein states that the methodology Hendrix refers to as "EBM" is a methodology used by physicians only during treatment. According

to Epstein, a treating physician employing EBM to confront a known diagnosis would "seek guidance from scientific studies" to identify possible treatment options, "analyze what the comparative success results have been with each of the tested treatment options," and then select the option that appears most likely to succeed. The physician using EBM would place "greater emphasis" on those treatment options that have the best proven chances of success. According to Epstein, EBM does not serve as a methodology for determining etiology. Epstein maintains that his reference to "evidence-based medicine" in this case meant that he consulted peer-reviewed medical literature ("evidence") for information concerning the possible cause of Perryman's conditions. Finally, Epstein states his methods in this case are based on his "training, education, and experience as a board-certified neurologist."

▮ The court accepts Epstein's explanation about his reference to "evidence-based medicine" in this case. In doing so, the court notes that Epstein reviewed Perryman's medical records, which he submits contain no evidence of a spinal cord injury occurring as a result of the accident, and Epstein's initial report provides considerable information concerning the classification and causes of spinal malformations, including citations to medical articles or studies (which do not appear in the record, however). The court also notes that Epstein bases his opinion partly on the opinion of Evenflo pediatric neuroradiology expert Dr. Zimmerman, who opines that Perryman has a hydromyelia which is congenital in cause, which opinion the court has found reliable and admissible.[75]

---

73. Dr. Hamburger apparently has held a number of hospital and teaching positions in the United States.

ranked for their scientific reliability, and the practitioner is encouraged to employ the treatment with the best-documented rate of success. Some in the medical community appear opposed to this, calling it derogatory of traditional clinical experience. A. Miles et al., *Evidence-based medicine: why all the fuss? This is why*, 3 J. of Eval. in Clinical Practice, 2, 83–86 (1997) (doc. 304–6). This footnote is offered by way of explanation; the court in no way takes a position as to the validity of EBM. As discussed above, the court's decision to admit Epstein's testimony is based on his use of a scientifically reliable methodology under Rule 702.

74. At oral argument, Evenflo acknowledged that its memorandum inaccurately states that Epstein made only one reference to EBM in "a single sentence."

75. An expert may properly rely on the opinion of another expert. *Concerned Area Residents for the Environment v. Southview Farm*, 834 F.Supp. 1422, 1436 (W.D.N.Y.1993), *rev'd on other grounds by* 34 F.3d 114 (2d Cir.1994) (citing

The court concludes that Epstein used a traditional, generally accepted methodology for determining the etiology of Perryman's alleged hydromyelia. For these reasons, Hendrix's motion to exclude the testimony of Mark Epstein was denied.[76]

### 12. Joel Morgan[77]

Dr. Joel Morgan, an expert for Evenflo, is a practicing neuropsychologist and an assistant professor of neurology and neurosciences at the University of Medicine and Dentistry of New Jersey. He holds a B.A., M.A., and Ph.D. in psychology. In summary, Morgan opines that although Perryman does appear to have ASD his ASD is not the result of head injuries he received in the accident because there is no medical literature to support a correlation between a head injury and autism. Also, according to Morgan, Perryman does not show symptoms consistent with traumatic brain injury. Finally, Morgan offers autism opinions on Tanner Perryman.

All of Morgan's opinions which Hendrix seeks to exclude pertain to autism and/or brain disorders allegedly affecting Gatlin or Tanner Perryman. As the court has already determined, there will be no opinion testimony from any expert on the cause of Perryman's ASD based on the record before the court. As to any opinion about whether Perryman has a brain injury, Evenflo concedes Morgan is not a medical doctor and, therefore, is not qualified to offer opinions on Perryman's brain injury.

For these reasons, Hendrix's motion to exclude the opinions of Joel Morgan was granted.

**DONE and ENTERED.**[78]

---

Fed.R.Evid. 703). The judicial inquiry is whether the first expert's opinion is "of a type reasonably relied upon by experts in the particular field." Fed.R.Evid. 703; *see also Bauman v. Centex Corp.,* 611 F.2d 1115, 1120 (5th Cir.1980); *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc) (holding that rulings of former Fifth Circuit are binding precedent in the Eleventh Circuit unless overturned). Experts may not, however, simply repeat or adopt the findings of other experts without investigating them. *In re Polypropylene Carpet Antitrust Litig.,* 93 F.Supp.2d 1348 (N.D.Ga.2000) (citing *In re TMI Litig.,* 193 F.3d 613, 715–16 (3d Cir.1999) (finding blind reliance by expert on other expert opinions demonstrates flawed methodology under *Daubert*); *TK–7 Corp. v. Estate of Barbouti,* 993 F.2d 722, 732–33 (10th Cir.1993) (excluding expert opinion relying on another expert's report because witness failed to demonstrate a basis for concluding report was reliable and showed no

familiarity with methods and reasons underlying the hearsay report)). Here, it was permissible for Epstein to rely on the opinion of Zimmerman, a qualified pediatric neuroradiologist, to interpret Perryman's brain images because he had a reasonable belief that Zimmerman's opinion was reliable.

**76.** With EBM no longer at issue, Hendrix's Rule 403 objection is moot.

**77.** His opinion is presented to the court through numerous reports and an undated declaration prepared in response to Hendrix's motion (doc. 340–2).

**78.** The Clerk shall enter this Memorandum Opinion as an Addendum to the Court's Order On Motion to Exclude or Limit Expert Testimony (doc. 457).